*County Council of Prince George's County v. Robin Dale Land LLC, et al.*
No. 0255, September Term, 2021
Opinion by Kehoe, Christopher B., J.

Zoning — Mootness — Comprehensive Rezoning — Prince George's County's 2021
Countywide Sectional Map Amendment

As a general rule enactment of a comprehensive rezoning statute renders moot pending
land use cases that arose under the prior statute. *See, e.g., Mayor & Council of Rockville
v. Dustin*, 276 Md. 232, 233 (1975) ("An appeal in a zoning case should be dismissed as
moot where, as here, the zoning application has been superseded by a subsequent
comprehensive rezoning act of the zoning authorities.")

The Supreme Court of Maryland has identified the essential attributes of comprehensive
rezoning legislation as follows:

> The requirements which must be met for an act of zoning to qualify as
> proper comprehensive zoning are that the legislative act of zoning must:
> 1) cover a substantial area; 2) be the product of careful study and
> consideration; 3) control and direct the use of land and development
> according to present and planned future conditions, consistent with the
> public interest; and, 4) set forth and regulate all permitted land uses in all or
> substantially all of a given political subdivision, though it need not zone or
> rezone all of the land in the jurisdiction.

*Anderson House, LLC v. Mayor & City Council of Rockville*, 402 Md. 689, 707 n.17
(2008) (cleaned up).

In Prince George's County, comprehensive rezoning laws are called "sectional map
amendments." The Prince George's County Code identifies additional substantive criteria
that must be considered by the District Council before it approves a sectional map
amendment. *See* PGCC § 27-222(b) (2021) (now codified as PGCC § 27-3503(b)(5)(A)).

In 2018, the District Council enacted a revised zoning ordinance. The new version of the
zoning ordinance contained twenty-one fewer zoning districts than its predecessor. The
enacting legislation provided that it would become effective on the date that the District
Council approved "a Countywide Sectional Map Amendment, for purposes of
effectuating the land use and zoning regulations" contained in the new ordinance.

In 2021, the District Council passed Resolution CR-136-2021, which applied a new
zoning classification to each of the approximately 300,000 properties located in the

portion of the Maryland-Washington Regional District located in Prince George's County. One of the recitals in CR-136-2021 states that the resolution was "designed to facilitate the technical reclassification of land from the current zone to the closest new zone contained in the replacement Zoning Ordinance[.]" The legislative history of Resolution CR-136-2021 is clear that the purpose and effect of the Countywide Sectional Map Amendment was to implement a "non-substantive" reclassification of each property to the most analogous zoning district in the new zoning ordinance. Nothing in the legislative history suggests that the Council, the Prince George's County Planning Board, or their respective staffs considered either the factors identified by our Supreme Court as bases for comprehensive rezoning or the mandatory standards for sectional map amendments listed in the Prince George's County Zoning Ordinance.

For these reasons, the enactment of the 2021 Countywide Sectional Map Amendment did not moot the issues presented in this appeal.

Circuit Court for Prince George's County
Case Nos.   CAL 1908050
                    CAL 1908051
                    CAL 1908279
                    CAL 1908280

<u>REPORTED</u>

<u>IN THE APPELLATE COURT</u>

<u>OF MARYLAND</u>

No. 0255
September Term, 2021

_____

COUNTY COUNCIL OF PRINCE GEORGE'S
COUNTY

v.

ROBIN DALE LAND LLC, ET AL.
_____

Kehoe*
Leahy,
Woodward, Patrick L.,
(Senior Judge, Specially Assigned)
JJ.
_____

Opinion by Kehoe, J.
_____

Filed: August 6, 2024

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

* Kehoe, Christopher B., now retired, participated in the hearing of this case while an
active member of this Court; after being recalled pursuant to the Constitution, Article IV,
Section 3A, he also participated in the decision and the preparation of this opinion.

** Kehoe, Stephen, J., did not participate in the Court's decision to designate this opinion
for publication pursuant to Md. Rule 8-605.1.

Table of Contents

Introduction

Background

   A. The Prior and Current Versions of the Prince George's County Zoning Ordinance

   B. The 2009 Sectional Map Amendments and Area Master Plans:
      Neale Drive, Robin Dale, and Christmas Farm
      MCQ

   C. The *Accokeek* Judicial Review Proceeding
      The First Remand in the *Accokeek* Case
      The Initial Judgment in the *Accokeek* Case
      The Final Judgment in the *Accokeek* Case
      The Second Remand to the Council and the 2013 Council Resolutions

   D. *Bazzarre et al. v. District Council et al.*

   E. The Third Remand to the District Council

   F. The Judicial Review Proceedings

   G. Chapter 429 of the 2021 Laws of Maryland

   H. The 2021 Countywide Sectional Map Amendment, the District Council's Omnibus Mootness Contention, and Appellees' Motion to Strike

The Standard of Review

The Parties' Contentions

Analysis

   1. The Requirement for a Public Hearing

   2. The District Council's Mootness Contentions

    A. The District Council's Omnibus Mootness Argument
       i. Judicial Notice
       ii. The Mootness Doctrine in Land Use Cases
       iii. The Recodification of the County Zoning Ordinance
       iv. The 2021 Countywide Sectional Map Amendment
       v. Our Conclusions

    B. The District Council's Second Mootness Contention: Growth Tier Designations for the Christmas Farm and the Neale Drive properties

   3. The District Council's Remaining Contentions

   4. Proceedings on Remand

In this consolidated appeal, we will consider four judgments entered by the Circuit Court for Prince George's County, the Honorable Lawrence V. Hill, Jr. presiding, that reversed legislation enacted in 2019 by the County Council of Prince George's County, sitting as the District Council. The legislation in question, Council Resolutions CR-11-2019 and CR-12-2019, revised sectional map amendments and area master plans originally enacted in 2009 to assign zoning and development tier classifications for certain properties located in Prince George's County Planning Subregions 5 and 6. The circuit court reversed the resolutions and remanded the cases to the District Council for proceedings consistent with its opinion.

The appellant in each of these cases is the District Council. The appellees are four landowners aggrieved by the Council's decisions: Robin Dale Land, LLC; Neale Drive, LLC;[1] Christmas Farm, LLC; and MCQ Auto Servicecenter, Inc.[2]

---

[1] Neale Drive, LLC is the successor-in-interest to ERCO Properties, Inc., which was the owner of one of the properties subject to this appeal in the earlier stages of this litigation. For consistency's sake, we will refer to ERCO Properties as "Neale Drive" in this opinion.

[2] The lead case in this appeal is *County Council of Prince George's County v. Robin Dale Land, LLC*. In the circuit court, this case was docketed as Circuit Court for Prince George's County Case No. CAL 19-08050. The remaining cases were docketed as follows:

*County Council of Prince George's County v. Neale Drive, LLC*, Case No. CAL19-08051;

(Footnote continued . . . .)

In their briefs, the parties present seven contentions,[3] which we have consolidated into five for purposes of our analysis:

_____

*County Council of Prince George's County v. Christmas Farm, LLC*, Case No. CAL19-08279; and

*County Council of Prince George's County v. MCQ Auto Servicecenter, Inc.*, Case No. CAL19-08280.

[3] In its principal brief, the District Council presents one issue:

Was the District Council's readoption of the Subregion 5 and 6 Master Plans and Sectional Map Amendments made within the legal boundaries of its plenary legislative powers?

On November 29, 2021, which was after the District Council filed its initial brief and the appellees filed their briefs, the Council enacted Council Resolution CR-136-2021. The resolution approved a Countywide Sectional Map Amendment which assigned new zoning classifications to the approximately 300,000 properties located in the Prince George's County part of the Maryland-Washington Regional District. In its reply brief, the District Council asserts that the enactment of CR-136-2021 moots these cases. The appellees have filed motions asking us to strike the Council's reply brief. We will address these matters in our analysis.

The appellees articulate the issues differently.

Robin Dale and Neale Drive:

1. Was the District Council's adoption of County Resolution (CR)-11-2019 for certain properties in Subregion 5 lawful and in accordance with *Bazzarre v. County Council*, 2017 Md. App. Lexis 565*, 2017 WL 2334472 (Md. Ct. Spec. App. May 30, 2017)?

2. Was The District Council's adoption of County Resolution (CR)-12-2019 for certain properties in Subregion 6 lawful and in accordance with *Bazzarre v. County Council*, 2017 Md. App. Lexis 565*, 2017 WL 2334472 (Md. Ct. Spec. App. May 30, 2017)?

Christmas Farm:

(Footnote continued . . . .)

1. Did the District Council's enactment of the 2019 sectional map amendments and growth tier area master plans comply with relevant provisions of the State and local law regarding notice and the right to a hearing?

2. Are these appeals moot in light of the District Council's enactment of Council Resolution CR-136-2021?

3. Do the doctrines of law of the case and res judicata bar relief sought by Christmas Farm and MCQ?

4. Are Christmas Farm's and Neale Drive's contentions that the District Council erred in its designations of development tiers for their properties moot in light of subsequent legislation enacted by the District Council?

5. Did the District Council give proper consideration of its grant of MCQ's revisory petition when it enacted the Subregion 5 sectional map amendment?

Our answers to questions 1 through 3 are no. The procedure employed by the District Council in enacting Resolutions CR-11-2019 and CR-12-2019 violated relevant provisions of both the Maryland–Washington Regional District Act and the Prince George's County Code. The Council's enactment of Resolution CR-136-2021 does not render these cases moot. The principles of law of the case and res judicata do not apply to

---

1. On remand from this Court in *Bazzarre*, was the District Council required to follow § 27-227 of the Zoning Ordinance?

2. In adopting CR-12-2019, did the District Council adequately review the record of the 2009 Subregion 6 SMA?

MCQ:
1. On remand from this court in *Bazzarre*, was the District Council required to follow § 27-227 of the Zoning Ordinance?

2. In adopting CR-11-2019, did the District Council adequately review the records of the 2009 Subregion 5 SMA and MCQ's revisory petition?

these cases in the ways that the District Council asserts. We will not address the merits of question 4 because the District Council failed to adequately brief the issue. Finally, the record is clear that the District Council did not consider its earlier decision granting MCQ's 2010 revisory petition.

We will affirm the judgments entered by the circuit court. The cases before us are to be remanded to the District Council for proceedings consistent with the judgments of the circuit court as supplemented and modified by this opinion.

BACKGROUND

A. The Prior and Current Versions of the County Zoning Ordinance

In 2018, the District Council repealed and reenacted the County Zoning Ordinance which was, and is, codified as Subtitle 27 of the County Code. At the same time, the Council amended the then-current version of Subtitle 27 to add certain transitional provisions. As relevant to the issues raised in these appeals, and with one exception, the provisions of the old and new versions of the County's Zoning Ordinance are substantively identical. The exception, and it is an important one, is that the current version of the Zoning Ordinance contains significantly fewer zoning use districts than did its predecessor.

The new version of the Zoning Ordinance became effective on April 1, 2022. The briefs filed in this case cite to the prior version of the Zoning Ordinance. For the sake of consistency, we will do the same. Where appropriate, we will identify the corresponding provision in the current Zoning Ordinance in footnotes.

B. The 2009 Sectional Map Amendments and Area Master Plans

The complicated legal, factual, and procedural background to these appeals was discussed at length in a prior opinion of a panel of this Court in *Bazzarre v. County Council of Prince George's County Maryland*, No. 1016, Sept. Term, 2014, 2017 WL 2334472, at \*2–13 (Md. Ct. Spec. App. May 30, 2017). What follows is a summary of the twists and turns that occurred prior to the filing of the opinion in *Bazzarre* and a more detailed description of what took place thereafter.

For zoning and land use planning purposes, Prince George's County is divided into geographical areas that are termed "subregions." Decades ago, the District Council enacted area master plans and zoning use maps (originally called "sectional maps") for each subregion. The legislation enacting a revised zoning map is termed a "sectional map amendment" and is often referred to in the record by the acronym "SMA." Periodically, area master plans and sectional map amendments are reviewed and modified as appropriate.[4]

The initial versions of proposed area master plans and sectional map amendments are prepared by the staff of the Maryland-National Capital Park and Planning Commission

---

[4] *See* Prince George's County Code ("PGCC") § 27-641(c) (requiring the Prince George's County Planning Board, with the written concurrence of the District Council, to adopt an area master plan not later than six years after the adoption of a sectional map amendment for the planning area), and § 27-221 (requiring the District Council to schedule a sectional map amendment for each planning area at least once every ten years). These statutes are currently codified without substantive amendment as PGCC §§ 27-3502(h)(4) and 27-3502(h)(5).

(the "Commission"). After the proposed master plan and proposed sectional map amendment are approved by the Prince George's County Planning Board, the documents are forwarded to the District Council for its own review, modification, and ultimate enactment. The Prince George's County Code ("PGCC") contains procedural and substantive requirements for this process. The local statutory provisions most relevant to this case in its current posture are found in PGCC §§ 27-227 and 27-228,[5] and we will discuss them later in this opinion.

The cases before us arise out of the District Council's 2009 adoption of updated area master plans and sectional map amendments for Subregions 5 and 6 in Prince George's County.[6] The process of evaluating and revising area master plans and sectional map amendments was, and is, subject to provisions of Maryland's Public Ethics Law that apply exclusively to Prince George's County. The provision of the Public Ethics Law most pertinent to this case is Md. Code, Gen'l Provs. § 5-835, which applies to persons who participate in area master plans and sectional map amendment processes "where the intent is to intensify the zoning category applicable to the land of the applicant." Gen'l Provs. § 5-833(d)(3).

Among other things, § 5-835 requires such persons to (1) file affidavits with their application disclosing all payments made by or on behalf of the applicant to District

---

[5] Sections 27-227 and 27-228 are currently codified without substantive amendment as PGCC § 27-3503(b)(7)(C) and PGCC § 27-3503(b)(7)(D).

[6] The MCQ, Robin Dale, and Neale Drive properties are located in subregion 5. The Christmas Farm property is in subregion 6.

Council members or their campaign committees within thirty-six months of the date of the application, or (2) state that no such payments had been made. Section 5-835 also prohibits members of the Council from participating in land use decisions involving applicants who had made such payments to them. Gen'l Provs. § 5-835(b). In 2021, the General Assembly passed what became Chapter 429 of the Laws of 2021. The statute amended Gen'l Provs. §§ 5-833 and 5-835 as those statutes applied to a "countywide zoning map amendment that is recommended by the Planning Board, where the intent is to implement an approved general plan by repealing and replacing all zoning categories applicable to land in Prince George's County." The provisions of Chapter 429 are relevant to the District Council's omnibus mootness contention. We will discuss the substance of this statute later in this opinion.

*Neale Drive, Robin Dale, and Christmas Farm*

In 2007, the District Council initiated area master plan reviews and comprehensive rezoning processes for Subregions 5 and 6. The Commission staff accepted requests from property owners to modify their properties' land use classifications. Among those who filed such requests were Neale Drive, Robin Dale, and Christmas Farm. Each of these entities owns a relatively large tract of undeveloped land and each sought more intensive zoning and/or planning classifications for their respective properties. Therefore, a representative of each of these entities was required to file the ethics affidavit required by Gen'l Provs. § 5-835. None of them did so. In failing to comply with the law, Neale Drive, Robin Dale, and Christmas Farm were not alone. Many, but by no means all, of the persons who sought more advantageous zoning or master plan classifications in the

2009 area master plan and sectional map amendment processes failed to file ethics affidavits.

The sectional map amendment and area master plan review, evaluation, and amendment process culminated on September 9, 2009, when the District Council enacted resolutions adopting new master plans and sectional map amendments for each planning region. Among the property owners who successfully persuaded the District Council to grant their requests for more intensive zoning and/or planning classifications were Neale Drive, Christmas Farm, and Robin Dale.

*MCQ*

At this point in the narrative, our focus shifts to the remaining appellee, MCQ. It is the owner of a 1.7 acre parcel in the rural community of Accokeek in Subregion 5 in southern Prince George's County. At one time, MCQ's property was the site of an automotive service station, which was destroyed by fire in 2004. The property has been vacant since then. When the 2009 master plan and sectional map amendment review and approval processes were initiated, MCQ's property was "split-zoned," that is, one part of the property was classified as C-M (Commercial Miscellaneous), while the remainder was classified as R-R (Rural Residential). An automotive service station is a permitted use in the C-M district but is not permitted in the R-R district.

MCQ did not seek a change to its zoning classifications in the sectional map amendment/area master plan amendment processes. Therefore, it was under no obligation to file an ethics affidavit while the sectional map amendment process was ongoing and it did not do so. However, and based on advice from its staff, the Prince George's County

- 8 -

Planning Board recommended that the C-M portion of the MCQ property be rezoned to R-R. Once it learned of the Board's recommendation, MCQ objected to the proposed change but to no avail. The Subregion 5 sectional map amendment adopted by the District Council classified the entirety of MCQ's parcel as R-R.

At this point, MCQ had a choice of remedies. First, it could file a petition for judicial review of the Council's decision. *See* Md. Code, Land Use § 22-407(a).[7] Second, MCQ could file a "revisory petition" pursuant to PGCC § 27-228.[8] In brief summary, § 27-228 permits a party aggrieved by a sectional map amendment's classification of their property to file a petition to revise the classification. If, after an evidentiary hearing, the Council concludes that the property's classification in the sectional map amendment review and approval process was based on "factual error" or "fraud on behalf of the District

---

[7] Land Use § 22-407 states in relevant part:

> (a)(1) Judicial review of any final decision of the district council [for Prince George's County], including an individual map amendment or a sectional map amendment, may be requested by any person or entity that is aggrieved by the decision of the district council and is:
>
> \*    \*    \*
>
> (iii) the owner of the property that is the subject of the decision; or
> (iv) the applicant.

[8] This statute is currently codified without substantive change as PGCC § 27-3503(b)(7)(D).

Council," the Council is authorized to restore the prior zoning classification. PGCC § 27-228(c).[9]

MCQ filed a revisory petition asserting that the planning staff's recommendation that its property be downzoned was based on erroneous information. When MCQ filed its petition, one of its owners, Jose Mararac,[10] filed an ethics affidavit affirming that neither MCQ nor its principals had made donations to any member of the District Council in the relevant time period.

After holding a public hearing, the District Council granted the petition. The Council's decision and its reasoning were documented and implemented in Zoning

---

[9] Specifically, PGCC § 27-228(c) stated in pertinent part:

> (c) Criteria for revision. (1)The District Council may only consider revising the Sectional Map Amendment for property that was reclassified to a zoning category other than that which existed prior to approval of the Sectional Map Amendment. Such consideration shall be based on the following criteria:
>
> (A) A factual error, which could not have been corrected by the property owner, was contained in the record of the Sectional Map Amendment proceedings which may have caused an erroneous description of a specific property, and which is sufficient to justify making a different decision on the Sectional Map Amendment. . . .
>
> (B) Evidence of fraud on behalf of the District Council.

In the revisory petition proceeding, MCQ asserted, and proved to the District Council's satisfaction, that the Planning Board's staff recommendation was based on factual errors. Fraud was not an issue.

[10] From what we can glean from the record, at some point Mr. Mararac became the sole owner of MCQ.

- 10 -

Ordinance No. 3–2010. After summarizing and evaluating the evidence presented at the

hearing, the Council stated in pertinent part:

> From the evidence presented, the District Council concludes that the SMA
> rezoning of the subject property from C-M to R-R was the result of
> mistake, or factual error, within the meaning of § 27-228 of the Zoning
> Ordinance. The MCQ Auto station, destroyed by fire about five years ago,
> should have been left in the C-M Zone when the Council approved the
> Subregion 5 Master Plan and Sectional Map Amendment, CR-61-2009.
>
> *     *     *
>
> The zoning approved herein is subject to the condition that prior to
> approval of any permits on the subject property, the owners shall obtain
> approval of a Detailed Site Plan from the Planning Board and District
> Council.

The decision of the Council became final on April 21, 2010. PGCC § 27-228(e)(6)

indicates that parties aggrieved by a revisory petition decision have the right to seek

judicial review of the decision. No petition for judicial review was filed in MCQ's case.

No one suggests that there were any improprieties or irregularities in the District

Council's decision.

C. The <em>Accokeek</em> Judicial Review Proceeding

Parties aggrieved by zoning and planning decisions made in the 2009 Council actions

filed petitions for judicial review challenging both the Subregion 5 and the Subregion 6

area master plans and sectional map amendments. Many of the judicial review actions

involved assertions that property owners and/or members of the District Council had

violated the Public Ethics Law. These actions were consolidated in a proceeding referred

to by the parties and the *Bazzarre* panel as the "*Accokeek* case." We will summarize its

relevant procedural history.

- 11 -

After the administrative record was transmitted to the circuit court but before the circuit court ruled on the merits of the contentions presented by the parties, members of the District Council's staff began to accept untimely-filed ethics affidavits. At least twenty-three persons whose properties had received favorable treatment by the District Council in the 2009 Resolutions filed affidavits during this period. However, these affidavits were not in the administrative record transmitted to the circuit court. To address this problem, the circuit court remanded the case to the District Council and instructed the Council to forward to the court:

> affidavits and/or all records *in possession of the [District Council]* which indicate whether any property owner who participated in the adoption of [the 2009 Resolutions], with the intent of intensifying the zoning category applicable to its property, tendered a "payment" to any member of the [District Council] . . . so that this Court may properly determine whether the [District Council] violated the substance of the provisions [in the Public Ethics Law].

*Bazzarre*, at *9 (emphasis added).

Instead of complying with the court's straightforward instruction, the District Council's staff sent notice of the court's order to some, but not all, of the property owners who had obtained favorable treatment in the sectional map amendment processes but who had not timely filed ethics affidavits. Neale Drive and Robin Dale were among the property owners who were contacted by the Council's staff and both entities belatedly

filed affidavits.[11] The Council's staff did not notify Christmas Farm and that entity did not file an ethics affidavit. The record returned to the circuit court included the untimely affidavits filed by property owners who had been notified by the District Council staff.

*The Initial Judgment in the Accokeek Case*

In due course, the circuit court entered a judgment in the *Accokeek* case affirming the zoning and plan designations of those properties for which both timely and belated ethics affidavits had been filed, and reversing the designations for those properties for which ethics affidavits had not been filed. As part of its order, the court made specific findings as to whether affidavits had been filed for more than seventy parcels which had received favorable treatment from the District Council. The court found that ethics affidavits had been filed for the Neale Drive and Robin Dale properties and affirmed their reclassifications. The court found that no affidavit had been filed on Christmas Farm's behalf and reversed its land use reclassifications.

MCQ was not a party to the *Accokeek* judicial review proceeding. Nonetheless, the circuit court's judgment noted that MCQ's property had been downzoned by the sectional map amendment from C-M to R-R but that the parcel had been "rezoned back to C-M

---

[11] In their briefs filed in the present appeal, and without reference to anything in the record, both Robin Dale and Neale Drive assert that they each "submitted a timely ethics affidavit in the 2009 Subregion 5 Master Plan and SMA process." This is not what the *Bazzarre* panel concluded. If the *Bazzarre* panel was wrong, then it is incumbent upon Robin Dale and Neale Drive to direct us to facts in the record to support their contention. Because they failed to do so, we will not consider the matter further. *See, e.g., HNS Dev., LLC v. People's Couns. for Baltimore County*, 425 Md. 436, 459 (2012).

after the filing of a Revisory Petition by the property owner." *Bazzarre*, at \*43 (quotation marks omitted).

*The Final Judgment in the Accokeek Case*

After the circuit court entered its order, a number of additional property owners moved to intervene. Many of the owners stated that they had not been notified by the District Council's staff that they had an opportunity to file an affidavit. They asserted that it was unfair to use ethics affidavits as the basis for affirming some rezonings and reversing others when the District Council failed to notify all affected landowners. The court held a hearing on these motions and thereafter issued a revised judgment. The court explained that:

> The troubling ethical lapses in our County over the last decade are not lost on the court. The District Council, the former counsel to the District Council and others were informed of the need for affidavits and turned a blind eye to the law. . . . [A]ffected property owners and interested persons were not uniformly notified of the need or opportunity for late filing of affidavits. This endangers the fair play [that] this court and the District Council [are] supposed to provide. To allow this matter to languish any longer would violate procedural and substantive due process rights established by the United States Constitution and the Maryland Declaration of Rights.

> [The circuit court previously] provided the District Council with a remedy to this situation, and that remedy was administered in a disjointed and uneven manner. Fearing a similar result in the future, the court cannot allow this matter to bounce indefinitely between the court and Council in an attempt to secure a piecemeal, *nunc pro tunc* remedy.

> Therefore, with the exception of certain unobjectionable pieces of property, this court has no choice but to return the matter to the District Council for review of the recommendations of the Maryland National Capital Park and Planning Commission.

- 14 -

The District Council should expediently review this matter and give great weight to certain properties that have received approval in other resolutions and actions of the Council based upon the 2009 resolution and Master Plan. To change these already approved properties would be a grave injustice.

\* \* \*

[It is] ORDERED, the Court hereby declares VOID the adoption of the [2009 Resolutions] for failure to meet the affidavit requirement pursuant to [Gen'l Provs.] § 15-831[.] Additionally,

[It is] ORDERED, that this matter is REVERSED with the exception of the following properties which are specifically excluded from this order[.]

2017 WL 2334472, at \*10–11, 31 (footnotes omitted).

The court specifically excluded three properties from its judgment because their zoning classifications were "handled in proceedings outside the scope" of the 2009 Resolutions. The zoning classification for at least one of those properties had been changed by a revisory petition. Even though the MCQ parcel's zoning had also been changed by a revisory petition, the court did not include the MCQ parcel among the properties excepted from its order. Moreover, MCQ was not a party to the *Accokeek* action. Additionally, although the 2009 Council resolutions adopting sectional map amendments and subregional master plan were declared void by the *Accokeek* judgment, the judgment did not address MCQ's revisory petition.

*The Second Remand to the District Council and the 2013 Council Resolutions*

As a result of the judgment in *Accokeek*, the case was again remanded to the District Council, which remanded the case to the County Planning Board. The Council's order to the Planning Board stated (emphasis added):

- 15 -

pursuant to [PGCC] § 27-227(a)[12] of the Zoning Ordinance, this matter is remanded to the Planning Board *for purposes of meeting the affidavit requirements* pursuant to [what is now Gen'l Provs. § 5-835(c)] and resubmittal of its January 2009 Preliminary Subregion [5 and 6] Master Plan[s] and Proposed Section Map Amendment[s] to the District Council[.]

*Bazzarre*, at *33.

However, as the *Bazzarre* panel explained, the straight-forward process contemplated in the District Council's order "went badly awry":

[D]uring the reconsideration process, the Planning Board did not limit itself to collecting ethics affidavits. Instead, it accepted new applications for zoning changes and updated its recommendations for previously considered applications. Additionally, the Planning Board's staff altered the record by removing testimony and other evidence submitted by property owners who had not timely filed ethics affidavits in the 2009 SMA and area master plan processes. Finally, the Planning Board changed some of its recommendations to the District Council regarding zoning classifications for certain properties.

*Bazzarre*, at *11.

Based upon the flawed record returned to it by the Planning Board, the District Council eventually adopted revised versions of the master plans and sectional map amendments for the two planning subregions (the "2013 Resolutions"). In these resolutions, the District Council assigned less intensive zoning and/or planning classifications to the Christmas Farm, Robin Dale, and Neale Drive properties.

---

[12] We will discuss PGCC § 27-227 in our analysis. At this point, it is sufficient to say that § 27-227 sets out an abbreviated process whereby the District Council can correct a procedural error in a sectional map amendment after a court finds the sectional map amendment enactment process is invalid because of a procedural defect.

Additionally, the Council changed the zoning classification of the MCQ property from C-M to R-R. In separate judicial review proceedings, the circuit court affirmed the 2013 Resolutions. Several property owners, including all of the appellees in the present case, filed petitions for judicial review. MCQ's appeal, together with appeals that raised issues pertaining to non-compliance with the Public Ethics Law, were resolved by a panel of this Court in *Bazzarre.*

### D. *Bazzarre v. County Council of Prince George's County*

The parties to the appeals presented a total of twenty-six appellate contentions, all of which were addressed by the panel in a necessarily lengthy and at times complicated analysis. 2017 WL 2334472, at *15–46.[13] The issue addressed by the *Bazzarre* panel that is important for the purposes of the current appeal was whether the District Council complied with the circuit court's instructions in the *Accoceek* judgment. We set out the relevant parts of the panel's analysis:

> We begin our analysis with an inarguable premise. In a society that honors the rule of law, judicial directives must be obeyed. This is particularly true of orders that constitute final judgments, as did the *Accokeek* Judgment.
>
> \*   \*   \*
>
> The District Council was a party to the *Accokeek* action so it is bound by the judgment entered in that case. Actions taken by the District Council that are in violation of the *Accokeek* Judgment are illegal and beyond the scope of the Council's lawful authority.

---

[13] There were additional parties in the *Bazzarre* appeals: the Accokeek Mattawoman Piscataway Communities Council and some of its members; Piscataway Road-Clinton MD, LLC; and eight individuals referred to collectively as "the Clagetts" in the *Bazzarre* opinion. None of these are parties to the present appeal.

*Id.* at \*29 (footnote and citations omitted).

The *Bazzarre* panel further explained (emphasis added):

> The District Council maintains its actions were not improper because:
> (a) the invalidated 2009 Resolutions, as voided laws, are inoperative; and
> (b) because PGCC § 27-227 explicitly authorizes it to readopt an SMA with
> amendments. Neither argument is convincing.
>
> As to the District Council's first point, we acknowledge that the 2009
> SMAs and area master plans are of no legal effect (at least with regard to
> the properties that are the subject of these appeals). However, the record
> developed before the Planning Board and the District Council formed the
> basis for the 2009 Resolutions. On the second point, our interpretation of
> PGCC § 27-227 does not render its language that the District Council may
> adopt amendments as part of its reconsideration of the SMAs nugatory. *The
> statute certainly authorized the District Council to adopt amendments to
> cure the procedural defect, or that naturally arose from additional
> information gained from the cured procedural flaws. It does not mean that
> the Council could adopt any amendment that it wished*.
>
> \*   \*   \*
>
> We hold that the *Accokeek* Judgment required the District Council to
> reconsider the 2009 Subregion 5 and 6 preliminary master plans and
> proposed SMAs based upon the record presented to the 2009 District
> Council, supplemented by updated information as to the filing of ethics
> affidavits. Once the ethics affidavits were updated, individual Council
> members, and the public, would know which members were barred from
> voting whether to approve the master plans and SMAs. . . . Such an
> approach is . . . consistent with PGCC § 27-227(a), which sets out an
> expedited process for reconsideration of an SMA when a prior approval has
> been reversed for a procedural defect.

*Id.* at \*35–36.

As to MCQ, the panel added the following:

> We are troubled by the circuit court's unexplained failure to include MCQ
> Auto in the list of properties excepted from the *Accokeek* Judgment. It is
> difficult to attribute this to anything other than oversight. But the proper

way for MCQ Auto to have addressed that issue was to intervene in the *Accokeek* action and seek appropriate relief.

\* \* \*

The appropriate remedy for MCQ Auto is for us to remand its case to the District Council for action based upon a consideration of the 2009 record— which is what Judge Green ordered—*as well as the record of the revisory petition proceeding—which fairness requires*.

*Id.* at \*44 (emphasis added).

The *Bazzarre* panel addressed another contention presented by MCQ:

MCQ Auto points out that its C-M zoning was restored to it by the District Council in 2010 through a revisory petition, which was a quasi-judicial proceeding. It argues that the District Council in 2013 should have been bound by that result. Maryland law is clear that an agency in a quasi-judicial proceeding may not grant relief and then deny it based upon a mere change of mind. But MCQ Auto points to no authority for the proposition that the findings of fact and conclusions of law contained in a local legislature's decision rendered in a quasi-judicial proceeding are binding upon the legislature in a *subsequent comprehensive rezoning*.

*Id*. at \*44 (cleaned up and emphasis added).

The *Bazzarre* panel's characterization of the District Council's 2013 decision as a "subsequent comprehensive rezoning" was wrong. The *Accokeek* court's amended judgment did not order the District Council to undertake a new comprehensive rezoning process. Instead, the court directed the Council to reconsider the record developed in the 2009 master plan and sectional map amendment proceedings as that record was supplemented with updated ethics affidavits. The record of the 2009 sectional map amendment for Subregion 5 included the decision of the District Council granting MCQ's revisory petition. The decision granting MCQ's revisory petition was the 2009 District Council's final word as to the proper zoning classification for MCQ's property and the

*Bazzarre* panel erred when it suggested otherwise. Because the panel erred, its holding as to this issue does not constitute the law of the case. Further, the holding has no claim or issue preclusive effect. *See Garner v. Archers Glen Partners, Inc.*, 405 Md. 43, 56 (2008) (explaining that the law of the case doctrine does not apply when the prior appellate decision "was clearly erroneous" and affording it preclusive effect "would work a manifest injustice") (quoting *Turner v. Hous. Auth. of Baltimore*, 364 Md. 24, 34 (2001)).

### E. The Third Remand to the District Council

Pursuant to the mandates issued in *Bazzarre*, the cases were again remanded to the circuit court. On July 20, 2018, the court remanded the cases to the District Council "for further action consistent with the opinions of the Court of Special Appeals." After appellees filed updated ethics affidavits, the District Council's staff prepared two resolutions for the Council's consideration. The two resolutions were considered by the Council in open session in a meeting held on February 12, 2019.

The District Council did not hold a public hearing. Instead, it considered the resolutions in a "work session," which meant that members of the public were permitted to observe but not to comment. The Council did not provide notice of the work session to appellees or their counsel. We set out the transcript of the relevant parts of this proceeding:

> CHAIR: All right. We are now within the Committee of the Whole on CR-011-2019 and CR-012-2019, Resolutions as previously read related to the Subregion 5 and Subregion 6 Sectional Map Amendments. And let me turn to [Counsel] for a Committee overview.
>
> [COUNSEL]: Actually, I think that the initiating sponsor wanted to make a statement to recommend.

CHAIR: Okay, Mr. Harrison, do you want to? Let me turn to Mr. Harrison for an opening comment.

MR. [SYDNEY J.] HARRISON: Thank you, Mr. Chair. I put these Resolutions forward in accordance with the binding Orders issued by the Appellate and the Circuit Courts as to the five properties affected therein. There is quite a history leading up to this point as you know, and—which I've read and I've been briefed on by the counsel for preparing these two Resolutions. For the benefit of the public and perhaps my colleagues, I will turn to counsel . . . for a short orientation.

CHAIR: [Counsel].

\* \* \*

[COUNSEL]: Okay, so beginning with CR-011, which deals only with properties within the plan boundaries of the Subregion 5 Master Plan, let's rewind the clock to 2007 when this body initiated a Comprehensive Plan and accompanying detailed zoning proposals for the area bounded by Subregion 5, which . . . is located entirely . . . in the southern portion of the County, largely in Clinton, Brandywine and Accokeek, to be inclusive.

\* \* \*

So, in accordance with procedure, the Planning Board went ahead in accordance with what the District Council told them, which was to put together a Preliminary Plan and public outreach and concepts, goals and guidelines, which leads to a joint public hearing for both, and this is the way it is always done as some if not all of you already know for Sectional Map Amendments and/or Master Plans as they go through consideration. A joint public hearing was held as to the Subregion 5 Master Plan and proposed Sectional Map Amendment. Testimony was taken, which was in turn digested by the Staff in the usual way for the Planning Board's consideration and action in the form of adopting the Master Plan and endorsing the Sectional Map Amendment. What they did was to transmit their recommendations to the District Council, and therefore the Staff went forward and did another briefing for the Council Members on what the Planning Board had endorsed and adopted, as well as what the Technical Staff had prepared by way of its digest of testimony. And in the case of Subregion 5, where I'll start first, which is the backdrop for CR-011, and the Council Member, formerly the Council Member of the District at that time, made a motion to direct Staff to prepare a Resolution declaring certain

revisions to the Sectional Map Amendment as to the Subregion 5 endorsed Sectional Map Amendment.

There were properties that were included in those amendments. [Those properties included] the [Neale Drive] property, the Robin Dale Land, LLC property, the Clagett or Bazzarre property,[14] and the MCQ Auto property. Those property owners, by way of testimony in the 2009 record to Appellate hearing testimony, requested what's known as an intensification with the exception of MCQ, but at the end of the day, they asked for something different than what Planning Board had requested.

The [2009] District Council as to these four properties decided ultimately to go with what those property owners had requested, which was not what Planning Board recommended.

Later on, litigation ensued in the Circuit Court of Prince George's, and that took place over a span of about three years. In October of 2012, the Circuit Court invalidated both the Master Plan and the Sectional Map Amendment wholesale, which means they reverted back to the land use categories they were assigned prior to the 2009 action to do the Master Plan.

Moving to Subregion 6 in a parallel vane [sic], similar litigation was filed only this particular plan only has one property at issue, and it's known as Christmas Farm. In that case, the property owner had requested an intensification. It was granted by the Council Member at the time, and it was invalidated by action of the Circuit Court and remanded to the District Council to make a new decision.

That brings us to 2013. In 2013 the Council again considered the testimony and the issue of the Affidavits was handled as to persons seeking zoning intensification for their land as to both the Subregion 5 and the Subregion 6 Master Plans and Sectional Map Amendments. The Council, on July 24, 2013, rendered new decisions as to the entirety of the Subregion 5 and Subregion 6 Master Plan and their respective Sectional Map Amendments.

Well, in 2013, the property owners affected here, and I'm just going to talk just collectively about [Subregions] 5 and 6 as to those five properties . . . [whose] owners decided to file a Petition for [Judicial] Review in the Circuit Court. In June of 2014, the Circuit Court of Prince George's County

---

[14] As previously explained, "the Clagetts" were eight individuals who were parties to the *Bazzarre* appeal. They are not parties to these appeals.

ruled that . . . the 2013 decision of the District Council to approve as to the properties, what Planning Board recommended, was valid.

Fast forward the following year these same folks filed for further relief in the Court of Special Appeals, and that oral argument was heard in 2016. On May 30 of 2017, the Court of Special Appeals by independent unreported opinion for each of these five properties ruled wherefore as follows: that the property owners were not entitled to their zone by way of this litigation but that the District Council needs to remand from the Circuit Court, reconsider and make, only as to these properties, a new decision but based solely on the closed joint record of public hearing testimony that was conducted for the Subregion 5 and Subregion 6 Master Plans and SMAs respectively.

So, in July of this year this—oh, and by the way, sorry, and to update the Affidavits. That was the other thing. So that has been complied with, and we're now here and before you, at the request of Council Member Harrison, are two Resolutions that, in the case of Subregion 6, state exactly what property is affected[15] and what the proposer's intention is to do that, that is, to essentially retain the pre-2009 zoning for the property, which is consistent with the Planning Staff recommendation in '09, with Planning Board's disposition in '09, and Planning Staff's recommendation in 2013 and Planning Board's disposition in 2013 and the District Council's disposition in 2013.

As to the other four properties[16] within the Subregion 5 Master Plan, the Resolution before you styled as CR-011-2019 deals with [those] properties.

\* \* \*

Based on this presentation, the District Council enacted two resolutions. The first, CR-11-2019, adopted an area master plan and a sectional map amendment for several properties located in Subregion 5, including the Neale Drive, Robin Dale, and MCQ

---

[15] The Christmas Farm property is located in Subregion 6.

[16] Namely, the Clagett, Neale Drive, the Robin Dale, and the MCQ properties.

properties; the second, CR-12-2019, did the same for the Christmas Farm property in

Subregion 6.

CR-11-2019 stated in relevant part:

> WHEREAS, having duly reviewed the record of joint public hearing
> testimony in accordance with State and County zoning laws, as modified by
> the equally applicable State Public Ethics Law provisions governing the
> Council's consideration and approval of the Subregion 5 Sectional Map
> Amendment and, in accordance with such orders issued by courts of
> competent jurisdiction, the District Council shall approve anew the
> Subregion 5 Sectional Map Amendment based on the 2009 record of joint
> public hearing testimony, as to those properties specified herein.

> NOW, THEREFORE, BE IT RESOLVED by the County Council of Prince
> George's County, Maryland, sitting as the District Council [that], the
> District Council hereby approves the Subregion 5 Sectional Map
> Amendment, as endorsed by the Prince George's County Planning Board of
> the Maryland-National Capital Park and Planning Commission and
> embodied within its approved resolution PGCPB Res. No. 09-109 (attached
> hereto Attachment A), for the following specific properties:

> PROPERTY NO. 1:
> Property Name:   "ERCO Properties, Inc."
> *    *    *
> Property Details: 284 acres of land in the R-A Zone . . . with existing sludge
> injection site, woodland and agricultural uses thereon.
> *    *    *
> 207 acres of the property are designated within the Rural Tier. 77 acres of
> the property are designated within the Developing Tier (within the County
> Growth Boundary).
> 2009 PGCPB[17] [Recommendation]:   Retain R-A for all 284 acres of land.
> No change to Rural Tier/ Developing Tier designations
> PROPERTY NO. 2:
> Property Name:   "Robin Dale Land, LLC"
> *    *    *

---

[17] An acronym for the Prince George's County Planning Board.

Property Details: 175.13 acres of land in the R-A Zone, erstwhile Golf course and club house. The entire property (175.13 acres) is designated within the Rural Tier of the County.

\*　　\*　　\*

2009 PGCPB [Recommendation]:  Retain R-A Zone and respective Rural Tier designations.

\*　　\*　　\*

PROPERTY NO. 4:
Property Name: "MCQ Auto Center"

\*　　\*　　\*

Property Details:  1.7 acres of disused property that is split-zoned, being within the R-R and C-M Zones. Was previously improved with a gas station and automotive repair shop that was destroyed by fire in 2006. The relevant portion of the property classified in the C-M Zone consists of 0.5 acre.
Master Plan Staff Discussion: The subject property was previously improved with a gas station use that has been vacant, boarded-up for a number of years, and is an eyesore. It is hoped that converting the property to a zone that is compatible with the surrounding residential land uses will enable future redevelopment of this land. MDE regulations will apply to ensure that clean-up is compliant with current environmental regulations.
2009 PGCPB: Rezone the 0.5-acre, C-M-zoned portion of the property to the R-R Zone.

\*　　\*　　\*

Resolution CR-12-2019 is almost identical to CR-11-2019. In relevant part, it stated:

 Property Name: "Christmas Farm"

Property Details: 117.14 acres in the R-A Zone
2009 Master Plan Discussion: The property abuts Rosaryville Park to the south and residential development to the west. To the north lies the as-yet-undeveloped Mill Creek residential subdivision, which will necessarily bring more road traffic to this area. Rosaryville Road and Woodyard Road experience high traffic volumes.
"Policy 2" within the approved Transportation Chapter of the master plan recommends that road systems be improved concurrently with anticipated development in the area to align road intersection capacity with demand. Both Woodyard Road and Rosaryville Road now perform poorly, according to standardized level-of-service assessments and experience significant respective congestion.

A potential expansion of development density could further compromise the transportation infrastructure affecting properties in this area. The adopted plan recommends caution as to future development, including the potential strains on water and sewer capacity. It should also be noted that this property is adjacent to Mount Airy plantation and Rosaryville State Park.

2009 PGCPB [Recommendation]: Retain R-A Zone

The zoning and growth tier classifications assigned to the properties by these resolutions were identical to the classifications assigned by the District Council in 2013 after these cases had been remanded to the Council by way of the circuit court's judgment in the *Accokeek* case.

## F. The Judicial Review Proceedings

Christmas Farm, Neale Drive, Robin Dale, and MCQ filed petitions for judicial review. The circuit court reversed the decisions of the District Council and, in an amended order dated March 5, 2021, remanded these cases to the District Council for:

reconsideration in accordance with Section 27-227[18] of the Prince George's County Code, including the requirement to conduct a public hearing with prior notice, and it is,

FURTHER ORDERED, that amendments to Subregion 5 and Subregion 6 are restricted to those that naturally arise from the affidavits and/or the correction of procedural errors, and it is,

FURTHER ORDERED, as to Petitioner MCQ Auto Servicecenter, Inc. only, that the District Council shall clarify its response to the Petitioner's Revisory Petition, and it is,

FURTHER ORDERED, that the record shall be clear, as to the basis of its decision arises from the unredacted 2009 record.

---

[18] PGCC § 22-227 is now codified as PGCC § 27-3503(b)(7)(C).

The District Council filed a timely notice of appeal.

## G. Chapter 429 of the 2021 Laws of Maryland

While this appeal was pending, the General Assembly enacted Chapter 429 of the 2021 Laws of Maryland. Chapter 429 contained both codified and uncodified provisions. The codified portion of the statute amended Gen'l Provs. §§ 5-833 and 5-835 to provide that, notwithstanding other provisions of the State Ethics Law, members of the District Council could participate in the consideration and enactment of

> a countywide zoning map amendment that is recommended by the [Prince George's County] Planning Board, where the intent is to implement an approved general plan by repealing and replacing all zoning categories applicable to land in Prince George's County.

Gen'l Provs. § 5-835(b)(2)(ii) (2021 Supp.).

The purpose of these amendments was to make sure that there would be a quorum of Council members to vote on the Countywide Sectional Map Amendment that is the basis of the District Council's omnibus mootness contention. The amendments to §§ 5-833 and 5-835 expired on December 31, 2022, which was after the District Council approved the Countywide Sectional Map Amendment. None of the parties assert that there was any impropriety on the part of the members of the District Council who participated in that process.

Chapter 429 also contained an uncodified section 2, which stated (emphasis added):

> (a) This section applies during the period when the District Council of Prince George's County is adopting and approving a countywide zoning map amendment for Prince George's County.

(b) Except on a demonstration of error in the public record after a public hearing, the Prince George's County Planning Board may not recommend, and *the District Council may not approve, any request made by or on behalf of any person for zone intensification that differs substantially from the applicable zoning category or classification recommended in the Proposed Guide to New Zones adopted by the District Council* on July 16 [sic], 2019, under Council Resolution 27-2 [sic].[19]

As we will discuss later, subsection 2 is relevant to the District Council's argument that this appeal is moot in its entirety.

### H. The Countywide Sectional Map Amendment, the District Council's Omnibus Mootness Contention, and Appellees' Motions to Strike

On November 29, 2021, the District Council passed Council Resolution CR-136-2021 which approved a Countywide Sectional Map Amendment that applied new zoning classifications to all of the approximately 300,000 properties located within the Prince George's County part of the Regional District.

In its reply brief, the District Council asserts that all of the appeals before us should be dismissed because they are moot. This is so, says the Council, because Council Resolution 136-2021 assigned new zoning classifications to the appellees' properties while these appeals were pending. The Council contends that Council Resolution 136-2021 was a comprehensive rezoning statute.

---

[19] There are two typographical errors in subsection 2. The resolution that approved the "Guide to New Proposed Zones" was Council Resolution CR-27-2019. The resolution became effective on July 23, 2019. *See* https://pgccouncil.us/589/Zoning-Ordinance-Portal#:~:text=On%20July%2023%2C%202019%2C%20the,2018%20on%20October%2023%2C%202018 (visited June 7, 2024).

In response, MCQ and Christmas Farm filed a joint motion to strike the District Council's reply brief in its entirety. Shortly thereafter, Christmas Farm and Neale Drive filed a line adopting the contentions presented by MCQ and Christmas Farm. On December 21, 2021, a panel of this Court entered an order deferring a decision on the motion to strike pending oral argument.

We will deny the motion to strike the District Council's reply brief for two reasons. First, if Council Resolution CR-136-2021 were a comprehensive rezoning ordinance, then the District Council would have the right to bring the legislation to this Court's attention. Second, the remedy sought by appellees is overly broad because the District Council's reply brief also addressed contentions made by the appellees in their briefs as to other issues.

THE STANDARD OF REVIEW

In a judicial review proceeding, this Court "look[s] through the circuit court's . . . decision[], although applying the same standards of review, and evaluate[s] the decision of the agency." *People's Couns. for Baltimore County v. Loyola Coll. in Maryland*, 406 Md. 54, 66 (2008) (quoting *People's Couns. for Baltimore County v. Surina*, 400 Md. 662, 681 (2007)). In the present appeal, the dispositive issues are questions of law, which we review without deference to the reasoning of the District Council. *County Council of Prince George's County v. Chaney Enters. Ltd. P'ship,* 454 Md. 514, 528 (2017) (citing *County Council of Prince George's County v. Zimmer Dev. Co.*, 444 Md. 490, 553 (2015)).

## THE PARTIES' CONTENTIONS

In its briefs, the District Council presents five contentions as to why the circuit court's judgment should be reversed.

The Council's first contention involves PGCC § 27-227,[20] which sets out a process that may be followed by the Council when a sectional map amendment is set aside by a court "because of procedural defects in the advertising, processing, or approval" of the legislation. The Council argues that § 27-227 does not apply to this case and therefore no public hearing was required.

---

[20] PGCC § 27-227 states:

Resubmittal and reconsideration.

(a) Where a Sectional Map Amendment is found by a court of competent jurisdiction to be invalid because of procedural defects in the advertising, processing, or approval, the District Council may (on its own motion) reconsider the Sectional Map Amendment. The Council may then reapprove the Sectional Map Amendment (including amendments) in accordance with the procedures which apply to the original approval (except the hearing notice requirements).

(b) Prior to reapproval, the Council shall hold a public hearing on the matter.

(c) The public hearing shall be advertised in the County newspapers of record once a week for at least two (2) consecutive weeks prior to the hearing date. The notice shall contain the date, time, place, and purpose of the hearing.

(d) Upon resubmission, the records of the previous hearings on the Sectional Map Amendment shall be incorporated into the record of the new hearing.

Second, and as we have previously mentioned, the Council contends that all of the appellees' appellate contentions are moot in light of the District Council's enactment of Resolution CR-136-2021.

Third, the Council asserts that it addressed the significance of the Council's decision on MCQ's revisory petition in CR-11-2019. In support of this, the Council relies on its attorney's presentation at the District Council's work session and language in resolution CR-11-2019 that we have set out in our factual background portion of this opinion.

Fourth, the District Council maintains that Neale Drive's and Robin Dale's claims that the Council erred when it assigned growth tier classification to their properties are moot because the Council has since enacted legislation pursuant to the Sustainable Growth and Agricultural Preservation Act of 2012, codified as Title 1, subtitle 5 of the Land Use Article.

Fifth, the District Council asserts that the doctrine of res judicata bars relitigation of some or all of appellees' claims.

The appellees take issue with each of the contentions presented by the District Council.

ANALYSIS

1. The Requirement for a Public Hearing

As we have related, the District Council enacted the resolutions at issue in this appeal after being briefed by its counsel in a work session in which only members of the Council and its staff were permitted to speak. Members of the public were permitted to observe but not to comment. The appellees were not provided with notice of the work session.

The appellees argue that PGCC § 27-227 requires the Council to hold a public hearing before enacting the sectional map amendments. The circuit court agreed with them and reversed the Council's decisions.

The District Council asserts that the circuit court erred because PGCC § 27-227 doesn't apply to this case. The entirety of the Council's argument on this point is:

> [Section 27-227] is triggered **only if** Council, **on its own motion, reconsiders** a Sectional Map Amendment *after* it was found to be invalid by a court—as was the scenario in 2012. However, in 2019 (unlike 2012), *Council did not, on its own motion,* reconsider the Plans pursuant to PGCC § 27-227. Because PGCC § 27-227 was inapplicable on remand, the circuit court erred when it voided and reversed the 2019 Plans.

(Formatting in original.)

Initially, we point out that it is an appellant's obligation "to articulate and adequately argue all issues the appellant desires the appellate court to consider in the appellant's initial brief." *Westminster Mgmt., LLC v. Smith*, 486 Md. 616, 674 (2024) (quoting *Oak Crest Vill., Inc. v. Murphy*, 379 Md. 229, 241 (2004)). Moreover, "if a point germane to the appeal is not adequately raised in a party's brief, the court may, and ordinarily should, decline to address it." *Westminster*, 486 Md. at 674 (cleaned up) (quoting *DiPino v. Davis,* 354 Md. 18, 56 (1999)). The District Council's summary discussion of its § 27-227 contention is perilously close to, if not over, the line drawn by the Supreme Court in *Westminster*, *DiPino*, and other decisions. However, because the issue would otherwise arise again on remand, we will explain why the Council's reading of § 27-227 is incorrect.

Statutory construction involves:

> an examination of the statutory text in context, a review of legislative history to confirm conclusions or resolve questions from that examination, and a consideration of the consequences of alternative readings. "Text is the plain language of the relevant provision, typically given its ordinary meaning, viewed in context, considered in light of the whole statute, and generally evaluated for ambiguity. Legislative purpose, either apparent from the text or gathered from external sources, often informs, if not controls, our reading of the statute. An examination of interpretive consequences, either as a comparison of the results of each proffered construction, or as a principle of avoidance of an absurd or unreasonable reading, grounds the court's interpretation in reality."

*Blue v. Prince George's County*, 434 Md. 681, 689 (2013) (quoting *Town of Oxford v. Koste*, 204 Md. App. 578, 585–86 (2012)).

When deciding what a statute means, Maryland courts "consider the plain language of the statute, and its role in the broader statutory scheme[.]" *In re Z.A.*, 261 Md. App. 293, 309 (2024). The "broader statutory scheme" that PGCC § 27-227 inhabits includes both State and local law. *See Zimmer*, 444 Md. at 522–29 (main text and notes 28–39) (discussing the intertwined relationship between the County's Zoning Ordinance and the Maryland–Washington Regional District Act, codified as Division II of the Land Use Article). The lessons that we derive from considering "the broader statutory scheme" in the present case are clear.

We will start with the relevant State statute, which is part of the Regional District Act. Land Use § 22-206 states in pertinent part (emphasis added):

> (a) A district council may amend its zoning laws, *including any maps*:
> (1) in accordance with procedures established in its zoning laws; and

(2) *after holding an advertised public hearing.*[21]

Land Use § 22-206 unquestionably applies to Prince George's County. *See Grant v. County Council of Prince George's County*, 465 Md. 496, 513 (2019).

Turning to local law, PGCC § 27-226(b)(1)(A) states that the "District Council shall hold a public hearing on each proposed Sectional Map Amendment."[22] Section 27-226(b) is fully consistent with Land Use § 22-206.

---

[21] The corresponding statutory provision for the amendment of plans in Prince George's County, including area master plans, is Land Use § 21-216. The statute states in pertinent part:

> (a)(1) After a public hearing, the district council shall establish by local law or subsequent amendment to the local law procedures for the Commission to initiate, submit, adopt, and amend a plan or part of a plan, and for the district council to approve or amend a plan or part of a plan.
> (2) The district council shall publish notice of the time and place of the public hearing in at least one newspaper of general circulation in the county at least 30 days before the hearing.
> (b) The procedures established in accordance with subsection (a) of this section shall:
> 
> \*    \*    \*
> 
> (2) provide for one or more public hearings on the plan to be held jointly by the Commission and the district council, at the direction of the district council, after 30 days' notice by publication in a newspaper of general circulation in the county[.]

[22] PGCC § 27-226 is now codified at § 27-3503(b)(3). Under certain circumstances, the public hearing that the District Council is required to hold is a joint one with the County Planning Board. *See* PGCC §§ 27-225.01 and 27-225.01.05. (These sections have been recodified as PGCC §§ 27-3503(b)(3) and 27-3407(b)). No party asserts that the District Council was required to hold a joint hearing with the Planning Board in the present case.

The District Council's argument in the present case rests entirely on PGCC § 27-227, which states (emphasis added):

(a) Where a Sectional Map Amendment is found by a court of competent jurisdiction to be invalid because of procedural defects in the advertising, processing, or approval, the District Council may *(on its own motion)* reconsider the Sectional Map Amendment. The Council may then reapprove the Sectional Map Amendment (including amendments) in accordance with the procedures which apply to the original approval (except the hearing notice requirements).

(b) Prior to reapproval, the Council shall hold a public hearing on the matter.

(c) The public hearing shall be advertised in the County newspapers of record once a week for at least two (2) consecutive weeks prior to the hearing date. The notice shall contain the date, time, place, and purpose of the hearing.

(d) Upon resubmission, the records of the previous hearings on the Sectional Map Amendment shall be incorporated into the record of the new hearing.[23]

It is the Council's position that § 27-227(b)'s requirement for a public hearing applies only to situations in which a sectional map amendment is reversed by a court and the Council makes a voluntary decision to reconsider it. The Council contends that in the present case, it did not *choose* to reconsider the sectional map amendment; instead, the Council was *directed* to do so by the *Bazzarre* panel. Therefore, concludes the Council, § 27-227(b)'s requirement for a public hearing is inapplicable. The Council's argument is

---

23 Former § 27-227 is now recodified as PGCC § 27-3503(b)(7)(C).

neither supported by the plain language of the statute nor consistent with State and local law.

Section 27-227 sets out an expedited process that the District Council may follow when a sectional map amendment is reversed by a court "because of procedural defects in the advertising, processing, or approval[.]" Section 27-227(a) authorizes the Council to re-approve the sectional map amendment together with any amendments "in accordance with the *procedures which apply to the original approval* (except the hearing notice requirements)." (Emphasis added.)[24] Those procedures include the public hearing required by both the Regional District Act and the Prince George's County Code. *See*

---

[24] But § 27-227 must be read in context and that context includes PGCC § 27-225, which required the Planning Board to provide redundant forms of public notice for proposed sectional map amendments. Section 27-225(e)(1) required the Board to publish a notice of the hearing date of the proposed sectional map amendment. Additionally, § 27-225(e)(2) required the Board to mail written notice of the pending map amendment to the owners of real property located in the planning subregion(s) affected by the proposed amendment. Finally, § 27-225(e)(3) required the Planning Board to mail a separate notice of the public hearing to "all owners of land for which a change in zoning is proposed in the Sectional Map Amendment[.]"

When § 27-225 and § 27-227 are read together (as they should be), the apparently problematic language in § 27-227(a) means that the District Council was not obligated to provide the full panoply of notice required by § 27-225(e). Section 27-227(c) imposes a much less burdensome notice requirement when a sectional map amendment is remanded to the Council.

Land Use § 22-206; PGCC § 27-226(b). If there is any doubt about the matter—and there really isn't—§ 27-227(b) reiterates the public hearing requirement.[25]

Finally, and at the risk of pointing out the obvious, the District Council's work session was not the effective equivalent of a public hearing. *See Montgomery County v. Woodward & Lothrop, Inc.*, 280 Md. 686, 710 (1977) ("Properly to be inferred from a statutory right to a public hearing on a zoning map amendment application is a right to a fair hearing in all respects, including the privilege of introducing evidence and the duty of deciding in accordance with the evidence."); *See also Ford v. Baltimore County*, 268 Md. 172, 187 (1973) ("A '*hearing*' contemplates more than mere *attendance* by the public; it connotes a meeting which the public has the right to attend *and* the right to be *heard*.") (quoting *In re Kurren's Appeal*, 417 Pa. 623, 630 (1965)) (emphasis in *In re Kurren*).

The District Council erred when it enacted CR-11-2019 and CR-12-2019 without holding the public hearings required by both State and County law.[26]

---

[25] To avoid this result, the District Council asserts that it has the discretion to decide whether to proceed under § 27-227 and it declined to do so. If we assume for purposes of analysis that the District Council is correct, there was no basis for the Council to ignore the public hearing mandates imposed by Land Use § 22-206 and PGCC § 27-226(b).

[26] The District Council is correct that § 27-227 authorizes, but does not require, the Council to employ the expedited process set out in the statute. But the alternatives that might be otherwise available to the Council do not apply in this case. After a sectional map amendment is reversed, the Council could decide to do nothing, which would leave the previous sectional map amendment in place. But the 2009 sectional map amendments were reversed as to the parties by the *Accokeek* judgment. Alternatively, the Council could refer the proposed sectional map amendments back to the Planning Board for the

(Footnote continued . . . .)

## 2. The District Council's Mootness Contentions

The District Council raises two mootness arguments. The first is that the Council's enactment of CR-136-2021 moots all of the contentions presented by appellees in the current appeals. The second is that Neale Drive's and Robin Dale's contentions that the Council erred when it assigned growth tier classification to their properties are moot because the Council has since assigned growth tier classifications to their properties by legislation enacted pursuant to the Sustainable Growth and Agricultural Preservation Act of 2012. We will deal with these matters separately.

## A. The Council's Omnibus Mootness Argument

The District Council contends that these cases are moot in their entirety because the current zoning classifications of appellees' properties derive from Council Resolution CR 136-2021, which enacted a Countywide Sectional Map Amendment. The Countywide Sectional Map Amendment changed the zoning classifications of the properties subject to this appeal in the following ways:

---

Board to reconsider and perhaps to amend the proposed sectional map amendment. But in the present case, referring the matter back to the Board would be an exercise in futility because the District Council's decision must be based on the 2009 record.

| Owner: | Zoning classifications assigned by the District Council in 2019: | Zoning classifications assigned in the 2021 Countywide Sectional Map Amendment: |
|---|---|---|
| Neale Drive | Area: 284 acres<br>Zoning: R-A (entire parcel) | AR (Agricultural, Residential)<br>RE (Residential Estates) |
| Christmas Farm | Area: 117.14 acres<br>Zoning R-A (entire parcel) | AR (Agricultural, Residential)<br>ROS (Reserved Open Space). |
| Robin Dale | Area: 175.13 acres:<br>Zoning: R-A (entire parcel) | AR (Agricultural, Residential) (97%) [162.8 acres]<br>3% RR (Residential, Rural) (3%) [5.2 acres] |
| MCQ | Area: 1.7 acres<br>Zoning: R-R | RR (Residential, Rural). |

The Council asserts:

> On November 29, 2021, the District Council adopted Council Resolution 136-2021—a comprehensive Countywide Map Amendment—or change in law—which reclassified the zone or zones of certain property previously reclassified in Council Resolution 11-2019 and Council Resolution 12-2019—both of which are the subject of this litigation.
>
> \* \* \*
>
> Because CR-136-2021 changed zone classifications for properties subject to this litigation (and because *Bazzarre* held that none of the Appellees possessed vested rights), this Court should decide this case according to zone classifications approved in CR-136-2019. *McHale v. DCW Dutchship Island*, LLC, 415 Md. 145 (2010) (A change in the law after a decision below and before final decision by the appellate Court will be applied by that Court unless vested or accrued substantive rights would be disturbed or unless the legislature shows a contrary intent.)

(Parallel citation omitted.)

The District Council's mootness argument is not persuasive. Before we explain why this is so, we must engage in some housekeeping.

- 39 -

The District Council includes 290 pages of documents in an appendix to its reply

brief to provide the documentary context for its contention that the passage of CR-136-

2021 moots the cases before us. None of this material is part of the record of this case.

The Council correctly observes that we may take judicial notice of adjudicative facts. *See*

Md. Rule 5-201(a); *Dashiell v. Meeks*, 396 Md. 149, 176 (2006). Although the Council

does not explain what we should judicially notice, the context suggests that the Council is

referring to the documents contained in the appendix to its reply brief. These are:

1. House Bill 980, which was enacted as Chapter 429 of the 2021 Laws of Maryland;

2. The District Council's agenda for its November 29, 2021 meeting;

3. District Council Resolution CR-136-2021, which was enacted on November 29, 2021;

4 A letter (together with numerous attachments) dated October 28, 2021, from Elizabeth M. Hewlett, Esquire, chair of the Prince George's County Planning Board, to the chair of the District Council regarding the proposed Countywide Section Map Amendment;

5. A letter dated March 28, 2019, from Ms. Hewlett to the chair of the District Council regarding the Planning Board's Transmittal to the Council of the Guide to New Zones;

6. A document titled "Proposed New Zone Comparison Map" for Robin Dale's property;[27]

7. A document titled "Proposed New Zone Comparison Map" for Neale Drive's property;

8. A document titled "Proposed New Zone Comparison Map" for MCQ's property;

---

[27] It appears that the new zone comparison maps were prepared by the Planning Board's staff.

9. A series of documents and exhibits submitted by counsel for MCQ Auto in support of its assertion that the Countywide Sectional Map Amendment should classify its property as "CS" (Commercial, Service Zone);

10. A document titled "Proposed New Zone Comparison Map" for Christmas Farm's property, together with a letter request that the property be classified as "RR" (Residential, Rural Zone) in the Countywide Sectional Map Amendment proceeding;

11. Excerpts from the transcripts of District Council hearings on September 13 and 14, 2021 regarding the proposed Countywide Sectional Map Amendment.

We will take judicial notice of all of these documents. Additionally, we take judicial notice of the other legislative enactments of the District Council cited in our analysis.

## ii. The Mootness Doctrine in Land Use Cases

A case is moot when there is "no longer an existing controversy when the case comes before the Court or when there is no longer an effective remedy the Court could grant." *Suter v. Stuckey*, 402 Md. 211, 219 (2007) (citing, among other cases, *Dep't of Hum. Res. v. Roth*, 398 Md. 137, 143 (2007)). As a rule, courts do not entertain moot controversies. *Suter*, 402 Md. at 219-20.

The mootness doctrine plays a particularly important role in land use cases because in such cases, "an appellate court is bound to decide a case according to existing laws, even though a judgment rightful when rendered by the court below should be reversed as a consequence." *Yorkdale Corp. v. Powell*, 237 Md. 121, 124 (1964) (cleaned up).

Application of the so-called *Yorkdale* rule renders land use appeals moot when pertinent zoning or other land use regulations change while the case is pending. *See, e.g., Armstrong v. Mayor & City Council of Baltimore*, 409 Md. 648, 670 (2009) ("[B]ecause the present litigation was ongoing at the time [the zoning ordinance was amended], the

substantive zoning textual amendment applies retrospectively to this case[.]"); *Mayor &*

*Council of Rockville v. Dustin*, 276 Md. 232, 233 (1975) ("An appeal in a zoning case

should be dismissed as moot where, as here, the zoning application has been superseded

by a subsequent comprehensive rezoning act of the zoning authorities.")

The Supreme Court of Maryland has identified the essential attributes of

comprehensive rezoning legislation as follows:

> The requirements which must be met for an act of zoning to qualify as
> proper comprehensive zoning are that the legislative act of zoning must: 1)
> cover a substantial area; 2) be the product of careful study and
> consideration; 3) control and direct the use of land and development
> *according to present and planned future conditions, consistent with the*
> *public interest*; and, 4) set forth and regulate all permitted land uses in all or
> substantially all of a given political subdivision, though it need not zone or
> rezone all of the land in the jurisdiction.

*Anderson House, LLC v. Mayor & City Council of Rockville*, 402 Md. 689, 707 n.17

(2008) (cleaned up and emphasis added) (quoting *Mayor & Council of Rockville v.*

*Rylyns Enters., Inc.*, 372 Md. 514, 535 (2002)).

In the Prince George's County Zoning Ordinance, the District Council has expanded

upon the concept of "present and planned future conditions, consistent with the public

interest[.]" PGCC § 27-222(b) states (emphasis added):

> Prior to the approval of a Sectional Map Amendment, the Council *shall*
> consider the following:
> (1) The character of the area under review;
> (2) The suitability of particular uses;
> (3) The protection of natural features in the area;
> (4) The conservation of the value of buildings and communities;
> (5) The most appropriate use of land throughout the County;

(6) Any adopted current staging policy, or Capital Improvement or Economic Development Program;
(7) The environmental and economic impact upon both the area under review and the entire County; [and]
(8) The protection of the health, safety, and general welfare of the citizens of Prince George's County.[28]

Returning to the case before us, the District Council contends that CR-136-2021 is a comprehensive rezoning statute as that concept has been developed in Maryland caselaw. Therefore, reasons the Council, this appeal is moot. Appellees disagree. They assert that CR-136-2021 was a non-substantive law changing the classifications of all properties in the Prince George's County portion of the Regional District[29] in order to align the classifications of those properties with the new zoning districts contained in the recodified County Zoning Ordinance.

We agree with appellees. Our review of CR-136-2021 and the context of its enactment leads us to conclude that the resolution was neither based on the considerations identified in the Maryland cases as hallmarks of comprehensive rezoning nor on the mandatory standards enunciated in PGCC § 27-222(b). Instead, CR-136-2021 was the last step in a multi-year process in which the District Council recodified its land use and development

---

[28] Former § 27-222 is now codified as PGCC § 27-3503(b)(5)(A). The only substantive difference between the two versions of the statute is that the current version includes additional criteria relating to the Military Installation Overlay Zone district. None of the properties involved in these appeals are located in an MIO district.

[29] "The Maryland–Washington Regional District encompasses 'the entire area of Prince George's County, except for the City of Laurel as it existed on July 1, 2008.'" *Zimmer*, 444 Md. at 525 n.31 (quoting Land Use § 20-101(b)).

regulations. The circumstances leading up to and including the enactment of CR-136-2021 point to the conclusion that the resolution was intended to reclassify each of the properties in the Prince George's County portion of the Regional District to the most analogous zoning district in the County's new Zoning Ordinance.

### iii. The Recodification of the County Zoning Ordinance

This part of our story began in 2014, when the Planning Board adopted, and the District Council approved, Prince George's 2035 General Plan ("Plan 2035"). At that point, the Council, together with the Maryland-National Park and Planning Commission, their respective staffs, consultants, stakeholders, and members of the public, began the monumental task of updating the County's Zoning Ordinance and Subdivision Regulations in order to "facilitate the implementation" of Plan 2035. *See* Zoning Ordinance Portal, PRINCE GEORGE'S COUNTY COUNCIL, https://pgccouncil.us/589/Zoning-Ordinance-Portal# (last visited June 11, 2024). As the District Council itself stated, this undertaking included "almost 400 meetings [with] as many stakeholder communities as possible[.]" Resolution CR-27-2019 at 6.[30]

This effort began to reach its conclusion in 2018, when the District Council passed Council Bill CB-013-2018, which enacted a revised zoning ordinance. Council Bill CB-013-2018 provided that the new version of the ordinance would become effective on the date that the District Council approves "a Countywide Sectional Map Amendment, for

---

[30] We have taken judicial notice of Council Resolution 27-2019 at the District Council's request.

purposes of effectuating the land use and zoning regulations" contained in the new ordinance.[31] What is significant for this appeal is that the revised ordinance contains significantly fewer zoning districts than did its predecessor.[32]

Next, the Planning Board developed a "Guide to New Proposed Zones,"[33] which included a "staff decision matrix" for the zoning reclassifications effected by the Countywide Sectional Map Amendment. The decision matrix was important because it was the means by which zoning classifications under the new Ordinance would be assigned to the approximately 300,000 properties located in the Prince George's County portion of the Regional District.

On July 23, 2019, the District Council enacted Council Resolution 27-2019, which directed the Planning Board "to prepare a Countywide Sectional Map Amendment for Prince George's County" in accordance with the requirements of Part 19 of the then-

---

[31] On the same day, the District Council enacted revised subdivision regulations (Council Bill CB-015-2018). The effective date of the revised subdivision regulations was also suspended until the effective date of the Countywide Sectional Map Amendment.

[32] The revised version of the County Zoning Ordinance contains twenty-one fewer districts than did its predecessor. *See* PRINCE GEORGE'S COUNTY PROPOSED GUIDE TO NEW ZONES (July 2019) at 5, 7. A copy of this document is attached as an exhibit to this opinion.

[33] The formal title of this document is "Prince George's County Countywide Sectional Map Amendment (CMA) Proposed Guide to New Zones July 2019." It is among the documents that we have judicially noticed at the District Council's request. A copy is attached as an exhibit to this opinion.

current County Zoning Ordinance.[34] In this resolution, the District Council "adopted certain goals, concepts and guidelines . . . and a proposed guide to the new zones" established in the 2018 Zoning Ordinance. *Prince George's County Council v. Concerned Citizens of Prince George's County*, 485 Md. 150, 238–39 (2023) (Booth, J., dissenting).

Among the goals, concepts and guidelines approved by the District Council in Resolution 27-2019 was the statement that the proposed Countywide Sectional Map

---

[34] Part 19 of the former County Zoning Ordinance was enacted in 2018 to authorize the enactment of a Countywide Sectional Map Amendment. Section 27-1900(a) stated in pertinent part (emphasis added):

> The procedures recited within this Part shall be used for purposes of preparing, considering, and approving a Countywide Sectional Map Amendment (hereinafter, "CMA"), which the District Council finds is essential . . . in order to implement the approved replacement Zoning Ordinance of Prince George's County, Maryland . . . . To this end, specific purposes of the CMA are:
>
> (1) To apply zoning categories contained in Prince George's County's new Zoning Ordinance to all real property in Prince George's County;
>
> (2) To provide for a comprehensive and systematic rezoning procedure that bridges the gap between the abrogation date of this Zoning Ordinance and the effective date of the new Zoning Ordinance;
>
> (3) To limit piecemeal rezoning;
>
> (4) To notify landowners, municipalities, special governed taxing districts, developers, civic associations, agencies, and other County stakeholders of the zoning changes impacting real property;
>
> (5) To provide the necessary foundation the new Zoning Ordinance requires before it can become effective; and
>
> (6) To efficiently and effectively rezone all property in the County in all Planning Areas comprehensively and systematically, in a timely manner, and in accordance with all applicable State and local laws.

Amendment was intended to accomplish "a non-substantive, technical zoning reclassification of land located within all Planning Areas" in that part of the County within the Regional District.

Another goal approved by the Council in Resolution CR-27-2019 was that the proposed Countywide Sectional Map Amendment process would "transition[] the existing zone categories for every property in the County . . . to the most similar zone category in the new Zoning Ordinance[.]" It is also significant that, in the recitals to Resolution 27-2019, the District Council repeatedly characterized the zoning reclassifications to be effected by the Countywide Sectional Map Amendment as "non-substantive."[35] The Planning Board agreed with the District Council's assessment. We

---

[35] Council Resolution 27-2019 states in pertinent part (emphasis added):

WHEREAS, pursuant to the Council's enactment of CB-014-2018 on October 23, 2018, Part 19 of the Zoning Ordinance establishes certain procedures for preparation, publication, consideration, and approval of a comprehensive amendment of the County Zoning Map, as a *non-substantive zoning reclassification of land* located within all Planning Areas of the County;

\* \* \*

WHEREAS, the approved Fiscal Year 2019 Planning Department Work Program includes preparation of a CMA *for the non-substantive zoning reclassification of land* located within all Planning Areas of the Maryland-Washington Regional District within Prince George's County, Maryland;

\* \* \*

WHEREAS, the Goals, Concepts, and Guidelines; and Public Participation Program . . . build upon the specific purposes of the CMA, specify the parameters guiding *the non-substantive zoning reclassification of land* located within all Planning Areas of the Maryland-Washington Regional District within Prince George's County, Maryland[.]

know this because, in a letter to the chair of the District Council dated March 28, 2019, Elizabeth M. Hewlett, Esquire, at the time the Chair of the Planning Board, described the Countywide Sectional Map Amendment as a "technical, non-substantive rezoning of all real property within [the Regional District in Prince George's County], which is necessary to implement the much-needed new Zoning Ordinance[.]"[36]

The Planning Board held an extensive hearing on the proposed Countywide Sectional Map Amendment before approving it and forwarding it to the District Council for its consideration. Among the documents transmitted by the Board was Planning Board Resolution No. 2021-133 which approved the proposed Countywide Sectional Map Amendment. In the resolution, the Board stated that the reclassification process used by its staff to prepare the Countywide Sectional Map Amendment was "designed to facilitate the technical reclassification of land from the current zone to the closest new zone contained in the replacement Zoning Ordinance[.]"[37]

Also among those documents is a memorandum to the Planning Board dated October 28, 2021, from Kierre McCune, who was the manager of the Countywide Sectional Map Amendment project, and Chad Williams, who was the project facilitator of the

---

[36] Ms. Hewlett's letter is among the documents that we have judicially noticed at the District Council's request.

[37] Planning Board Resolution No. 2021-133 is among the documents that we have judicially noticed at the District Council's request.

recodification of the County Zoning Ordinance.[38] In their memorandum, McCune and Williams made the following points that are relevant to the issues before us:

First, the purpose of the Countywide Sectional Map Amendment was to identify the zoning classification under the new ordinance that was the "most similar" to the classification of the property under the prior ordinance.

Second, the Countywide Sectional Map Amendment was "non-substantive [and] technical [in] nature" and was "not [a] substitute for the comprehensive planning and zoning process[.]"

Third, the Countywide Sectional Map Amendment "is not a venue for . . . intensification of property zoning." In support of this conclusion, McCune and Williams cited Chapter 429 of the Laws of 2021.[39]

---

[38] The McCune/Williams memorandum is among the documents that we have judicially noticed at the District Council's request.

[39] Additionally, McCune and Williams pointed out that MCQ and Christmas Farm requested changes to zoning classifications that:

> pertain to properties in active litigation. The applicants . . . argue that the zones should be changed to reflect the results of court action. However, in both cases the District Council has active appeals pending to both of the most recent court decisions.

> Staff is unable to do anything with these [requests] other than to confirm no error in the proposed zoning map for these properties; the zoning map is not being changed while active litigation is ongoing. The results of this litigation may well change the zoning map in the future, but any such changes to the zoning map can and would be done administratively.

We agree with McCune's and Williams' interpretation of the statute. In addition to the time-limited amendments to Gen'l Provs. §§ 5-833 and 5-835 that we have previously discussed, Chapter 429 contains an uncodified section 2, which states (emphasis added):

> (a) This section applies during the period when the District Council of Prince George's County is adopting and approving a countywide zoning map amendment for Prince George's County.

> (b) Except on a demonstration of error[40] in the public record after a public hearing, the Prince George's County Planning Board may not recommend, and the District Council may not approve, any request made by or on behalf of any person for zone intensification that differs substantially from the applicable zoning category or classification recommended in the Proposed Guide to New Zones adopted by the District Council on July 16, 2019, under [Council Resolution 27-2019].

In other words, Chapter 429(b) prohibited the Council from granting a request for a more intensive zone classification in the Countywide Sectional Map Amendment process. But comprehensive rezoning typically involves rezoning properties to more intensive use districts:

> In theory, and usually in practice, [in comprehensive zoning and rezonings] long study and consideration is given to the location of various human activities as they are distributed on the geographic plain, and analysis is made as to where particular types of growth are likely to occur, and where it would be best to allow growth to occur in reference to all of the other land use activities in the area or region in question. Ideally, growth then may be planned in a manner that allows for the expansion of economic

---

[40] Context indicates that "demonstration of error" is a reference to a situation in which application of the Guide to New Proposed Zones' decision matrix resulted in an erroneous initial zoning classification. In their report, McCune and Williams stated that those problems were handled administratively.

activities and opportunities in the area or region for the benefit of its residents[.]

*Rylyns*, 372 Md. at 532.

## v. Conclusion

In summary, the District Council points to nothing in the legislative history of Resolution CR-136-2021 that suggests that the hundreds of thousands of zoning reclassifications implemented by the resolution were based on the criteria identified by our Supreme Court as the hallmarks of comprehensive rezoning. Nor were those reclassifications based upon a consideration of the statutory criteria for sectional map amendments set out in the County Zoning Ordinance.[41] Additionally, the District Council points to nothing in the legislative history of Resolution CR-136-2021 that supports the

---

[41] PGCC § 27-222 states:

(a) Sectional Map Amendments shall be in conformance with the principles of orderly, comprehensive land use planning and staged development, and shall be based on the General Plan or the applicable Master Plan or Sector Plan.
(b) Prior to the approval of a Sectional Map Amendment, the Council shall consider the following:
(1) The character of the area under review;
(2) The suitability of particular uses;
(3) The protection of natural features in the area;
(4) The conservation of the value of buildings and communities;
(5) The most appropriate use of land throughout the County;
(6) Any adopted current staging policy, or Capital Improvement or Economic Development Program;
(7) The environmental and economic impact upon both the area under review and the entire County;

(Footnote continued . . . .)

notion that the resolution was intended to be a comprehensive rezoning statute in the sense that the term has been used in Maryland appellate opinions. Indeed, the record indicates that, until the District Council filed its reply brief in these appeals, neither the District Council, nor the Planning Board, nor their respective staffs viewed the hundreds of thousands of zoning reclassifications resulting from the 2021 Countywide Sectional Map Amendment as anything other than a technical, non-substantive process.

Without further commenting upon its abrupt and unexplained *volte-face*, we conclude that the District Council got it right when it characterized the Countywide Sectional Map Amendment as enacting non-substantive changes to assign zoning classifications to properties that best aligned with the zoning districts in the current ordinance. We hold that the Council's enactment of Resolution CR-27-2019 does not render moot the contentions presented by the appellees in these cases.

### B. The District Council's Second Mootness Contention: Tier Designations for the Christmas Farm and the Neale Drive Properties

Among the issues raised in *Bazzarre* were contentions by Christmas Farm and Neale Drive based on provisions of the Sustainable Growth and Agricultural Preservation Act of 2012.[42] They contended that, in 2009, the County had designated their properties in the

---

> (8) The protection of the health, safety, and general welfare of the citizens of Prince George's County.

Section 22-222 is now codified as PGCC § 27-3503(b)(5)(A).

[42] The Act is primarily codified in Md. Code Env't §§ 9-206 and 9-1110 and Md. Code Land Use §§ 1-501–509 and 5-104.

County's Development Tier. However, in 2013, that is, after the 2012 statute became effective, Robin Dale's property was redesignated to the Rural Tier, as was a portion of Neale Drive's. Both parties challenged the 2013 master plan tier designations. *Bazzarre*, 2017 WL 2334472, at \*23.

In response, the District Council asserted that these contentions were moot because in 2013, the County had designated all of Neale Drive's property and part of Christmas Farm's property as being in the Rural Tier. *Id.* at \*23.

The *Bazzarre* panel declined to address the merits of these contentions because "the record is inadequate for us to decide whether the issue of [Neale Drive's] and Robin Dale's tier designations is moot." *Id.* at \*24. The panel explained:

> [I]t is not clear whether the District Council reconsidered and readopted a new tier map as part of its adoption of CR-26-2014, or whether it merely adopted by reference the tier designations included in CR-80-2013 with modifications. If the District Council did the latter, then our decision concerning [Neale Drive's] and Robin Dale's tier designations pursuant to CR-80-2013 might affect their tier designations pursuant to CR-26-2014. Additionally, it is not altogether clear from the very large scale maps that are included in the extract and the appendix that the properties are, in fact, in the rural tier. Thus, we are unable to conclude with confidence that [Neale Drive's] and Robin Dale's contentions are moot.
>
> The County is free to renew its mootness contentions as to the tier classifications for Robin Dale and [Neale Drive] on remand.

*Id.*

The District Council has renewed its mootness argument in the Neale Drive and the Robin Dale properties. The factual basis for its contention is:

> In accordance with State Law—i.e.—The Sustainable Growth and Agricultural Preservation Act of 2012—the County adopted *new* laws in

2014 and 2017, which ***amended***, among other local laws, the 2009 and 2013 resolutions with respect to Tier designations. Specifically, the County adopted Plan Prince George's 2035 (or the 2014 General Plan) and the 2017 Prince George's County Resource Conservation Plan. The 2017 Conservation Plan designated Tiers for Robin Dale/Neale Drive/Erco. Under Plan 2035, the growth boundary is important because it designates the areas that are eligible to receive public water and sewer service and impacts where the County will grow and develop. Council's **2010** approval of Neale Drive/Erco's water and sewer category change from 5 to 4 ***was not*** part of the unredacted 2009 record. Regardless, Neale Drive/Erco did not obtain a "vested right" in Council's 2010 water and sewer category change that depended upon the approval of the 2009 Plans. *Bazzarre*, [2017 WL 2334472, at \*35]. These Plans retained Robin Dale and Neale Drive/Erco in the **Rural Tier**.

(Formatting in original.)

The District Council's brief does not contain citations to specific parts of Plan 2035 or the County's 2017 Resource Conservation Plan that support its contentions. Thus, just like the *Bazzarre* panel, "we are unable to conclude with confidence that [Neale Drive's] and Robin Dale's contentions are moot." *Bazzarre*, at \*24. Because we recognize the importance of the goals of Maryland's Sustainable Growth and Agricultural Preservation Act, we will not substitute guesswork for informed analysis. But, again because of the importance of this issue, we will give the District Council yet another opportunity on remand to develop a record to support its mootness contentions.[43]

---

[43] On remand, the parties must bear in mind that an appellate court "cannot be expected to delve through the record to unearth factual support favorable" to the parties. *Rollins v. Cap. Plaza Assocs.*, *L.P.*, 181 Md. App. 188, 201 (2008) (cleaned up).

### 3. The District Council's Remaining Contentions

The District Council asserts that the doctrines of law of the case and *res judicata* bar consideration of the contentions presented by MCQ and Christmas Farm. The Council asserts that their "petitions for judicial review could not advance any viable substantive legal challenge to the 2019 Plans because *Bazzarre* rejected such challenges in 2017[.]" This is unpersuasive. The *Bazzarre* panel did not assess the merits of hypothetical challenges to future decisions of the District Council. In the present appeals, neither MCQ nor Christmas Farm asserts that the 2009 Resolutions granted them vested rights. They do argue that the zoning classifications assigned to Christmas Farm in the 2009 resolution and to MCQ in the District Council's decision on its 2010 revisory petition were appropriate. On remand, Christmas Farm and MCQ are certainly entitled to assert that they are entitled to the zoning classifications under the new Zoning Ordinance that are most similar to the classifications awarded to them in 2009 and 2010.

In its brief, MCQ asserts that the District Council did not consider its revisory petition and the 2010 Council's decision to grant it in its 2019 deliberations. The Council disagrees, asserting that the transcript of the work session shows that both Council Member Harrison and its counsel discussed the revisory petition. The Council is wrong. Mr. Harrison made no substantive comments to his colleagues at all—he deferred to counsel. Absent from counsel's presentation was any suggestion that there was a dispute as to the appropriate zoning and tier designations. Also absent from counsel's presentation was any reference to the contentions of the appellees. Even more conspicuously absent was any reference to MCQ's revisory petition, much less a

reference to the fact that the District Council had granted the petition. In terms of fairly informing the members of the Council as to what were the actual issues confronting it, counsel's presentation was inadequate.[44]

## 4. Proceedings on Remand

For all these reasons, we agree with the circuit court that the District Council's adoption of Council Resolutions CR-11-2019 and CR-12-2019 must be reversed and these cases remanded to the Council for it to address the merits of appellees' contentions. The District Council's factual universe consists of the 2009 District Council record (including the record of MCQ's revisory petition), together with affidavits filed pursuant to Gen'l Provs. § 5-835 and information that logically "arose from additional information

---

[44] In its brief, the District Council attempts to buttress its argument by pointing to a recital in each of the 2019 resolutions that the Council:

> duly reviewed the record of joint public hearing testimony in accordance with State and County zoning laws [and] in accordance with such orders issued by courts of competent jurisdiction[.]

(Emphasis omitted.)

There is nothing in either the Regional District Act, the Prince George's County Code, or the *Bazzarre* opinion that requires District Council members to read every page (or any page) of the record developed in a sectional map amendment proceeding. The District Council's "due review" occurred when its counsel briefed it during the work session which resulted in the enactment of the resolutions that are the subject of these appeals. There is nothing in the record that suggests that the members of the Council, other than Mr. Harrison, had any knowledge of the matters before them other than counsel's briefing. But Mr. Harrison did not brief the Council; he asked counsel to do so, and her briefing was deficient.

gained from" the affidavits. *Bazzarre*, at *35. Additionally, MCQ is free to renew all of its revisory petition contentions.

Finally, as we have related, and in addition to reversing the decisions of the District Council and remanding these cases for the District Council to "conduct a public hearing with prior notice," the circuit court:

> FURTHER ORDERED, that amendments to Subregion 5 and Subregion 6 are restricted to those that naturally arise from the affidavits and/or the correction of procedural errors, and it is,
>
> FURTHER ORDERED, that the record shall be clear, as to the basis of its decision arises from the unredacted 2009 record.

In its briefs to this Court, the District Council has not challenged the propriety of these instructions. Accordingly, they are binding on the Council on remand.

The circuit court also instructed the District Council to "clarify its response to [MCQ's] Revisory Petition[.]" As part of that clarification, the Council should address the degree to which the District Council is bound in the present action by the factual findings and ultimate conclusion reached by the 2012 Council in the revisory petition proceeding. *See Becker v. Falls Rd. Cmty. Ass'n*, 481 Md. 23, 47 (2022); *Garrity v. Maryland State Bd. of Plumbing*, 447 Md. 359, 380 (2016); *Batson v. Shiflett*, 325 Md. 684, 701–03 (1992); *see also* RESTATEMENT (SECOND) OF JUDGMENTS § 83 (1982).

In conclusion, we deny appellees' motion to strike the District Council's reply brief.

We affirm the judgments of the circuit court and remand these cases for proceedings

consistent with this opinion.

> **THE JUDGMENTS OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY ARE AFFIRMED. APPELLANT TO PAY COSTS.**

Appendix
Prince George's County Countywide Sectional Map
Amendment (CMA) Proposed Guide to New Zones July 2019

Prince George's County
**Countywide Sectional Map Amendment (CMA)**

# PROPOSED Guide to
# New Zones

July 2019



M-NCPPC • Prince George's County Planning Department • pgplanning.org
*Project Website: zoningpgc.pgplanning.com*

# Let's get started...



## What's my new zone?

The following guide shows how the Countywide Sectional Map Amendment (CMA) will determine the appropriate new zone for all properties in the County. This tool will ensure that everyone is using the same rules and all conversions will be transparent, fair, and equitable.

## So, how does it work?

There are five sections to guide you in understanding how and why your property will have a new zone.

**Part 1:** New Zone Conversion Chart (Page 4)
Most property owners will use this chart and see minimal change to their zone.

**Part 2:** Mixed-Use Zone Decision Matrix (Page 8)
For properties not located in a Plan 2035 designated Center and zoned M-X-T, M-U-I, or M-U-T-C.

**Part 3:** Transit-Oriented/Activity Center Base Zones Decision Matrix (Page 16)

**Part 4:** US 1/Innovation Corridor (Page 20)
- Location Map
- Decision Matrix

**Part 5:** Recently Approved Sector Plans (Back Cover)
- 2018 Approved Greater Cheverly Sector Plan
- 2018 Approved East Riverdale-Beacon Heights Sector Plan

# New Zone Conversion Chart

## BASE ZONES—RESIDENTIAL

| Old Zone | Description | | New Zone | Description |
|---|---|---|---|---|
| R-E | Residential-Estate | → | RE | Residential Estate |
| R-R | Rural Residential | → | RR | Residential, Rural |
| R-80 | One-Family Detached Residential | → | RSF-95 | Residential, Single-Family—95 |
| R-55 | One-Family Detached Residential | → | RSF-65 | Residential, Single-Family—65 |
| R-35 | One-Family Semidetached, and Two-Family Detached, Residential | | | |
| R-20 | One-Family Triple-Attached Residential | → | RSF-A | Residential, Single-Family—Attached |
| R-T | Townhouse | | | |
| R-30 | Multifamily Low Density Residential | | | |
| R-30C | Multifamily Low Density Residential—Condominium | → | RMF-12 | Residential, Multifamily—12 |
| R-18 | Multifamily Medium Density Residential | | | |
| R-18C | Multifamily Medium Density Residential—Condominium | → | RMF-20 | Residential, Multifamily—20 |
| R-10 | Multifamily High Density Residential | | | |
| R-10A | Multifamily, High Density Residential—Efficiency | → | RMF-48 | Residential, Multifamily—48 |
| R-H | Multifamily High-Rise Residential | | | |

# BASE ZONES—NONRESIDENTIAL

| | |
|---|---|
| **C-O** | Commercial Office |
| **C-A** | Ancillary Commercial |
| **C-S-C** | Commercial Shopping Center |
| **C-1** | Local Commercial, Existing |
| **C-2** | General Commercial, Existing |
| **C-G** | General Commercial, Existing |
| **C-C** | Community Commercial, Existing |
| **C-W** | Commercial Waterfront |

→ **CGO** Commercial, General and Office

**EXCEPTIONS** rezone to **C-N** Commercial, Neighborhood if:

1. Located within the Plan 2035 Rural and Agricultural Area.

**OR**

2. Groups of properties less than one-acre, surrounded by a Single-Family Residential zone, and not on a major road.

| | |
|---|---|
| **C-M** | Commercial Miscellaneous |
| **C-H** | Highway Commercial, Existing |

→ **CS** Commercial, Service

| | |
|---|---|
| **C-R-C** | Commercial Regional Center |

→ **DELETED**

| | |
|---|---|
| **I-1** | Light Industrial |
| **I-3** | Planned Industrial/ Employment Park |
| **I-4** | Limited Intensity Industrial |
| **U-L-I** | Urban Light Industrial |

→ **IE** Industrial, Employment

| | |
|---|---|
| **I-2** | Heavy Industrial |

→ **IH** Industrial, Heavy

Deletion of the following zones is proposed because zone structures are duplicated or no longer in use; C-R-C, R-L, R-S, R-M, R-U, E-I-A, V-L, V-M, L-A-C, M-A-C, R-P-C, M-X-T, M-U-I, UC-4, UC-3, UC-2, UC-1, R-O-D, A-C-O, T-D-O, and D-D-O.

## BASE ZONES—RURAL AND AGRICULTURAL

| R-O-S | Reserved Open Space | → | ROS | Reserved Open Space |
| O-S | Open Space | → | AG | Agriculture and Preservation |
| R-A | Residential-Agricultural | → | AR | Agricultural-Residential |

## BASE ZONES—CENTERS

**Plan 2035 Center Designation**

| Regional Transit District (Downtown) | → | RTO-H | Regional Transit-Oriented, High Intensity |
| Regional Transit District | → | RTO-L | Regional Transit-Oriented, Low Intensity |
| Local Transit Center | → | LTO | Local Transit-Oriented |
| Town Center | → | TAC | Town Activity Center |
| Campus Center | | | |
| Neighborhood Center | → | NAC | Neighborhood Activity Center |

## PLANNED COMMUNITY ZONES/OTHER ZONES

| R-M-H | Planned Mobile Home Community | → | RMH | Planned Mobile Home Community |
| R-P-C | Planned Community | → | | DELETED |

## OVERLAY ZONES—POLICY AREAS

| C-B-C-A | Chesapeake Bay Critical Area Overlay Zone | → | CBCAO | Chesapeake Bay Critical Area Overlay Zone |
| APA | Aviation Policy Area | → | APA O | Aviation Policy Area Overlay |
| M-I-O | Military Installation Overlay | → | Zone MIO | Military Installation Overlay |

## OVERLAY ZONES—OTHER

| T-D-O | Transit District Overlay | → | DELETED |
| D-D-O | Development District Overlay | → | DELETED |
| A-C-O | Architectural Construction Overlay | → | DELETED |

## PLANNED DEVELOPMENT ZONES—TRANSIT-ORIENTED/ACTIVITY CENTER (Outside of Centers)

**M-X-T** Mixed Use-Transportation Oriented

**M-U-I** Mixed Use-Infill

→ **Go to page 8 for more information.**

**M-U-TC** Mixed-Use Town Center

→ **LMUTC** Legacy Mixed-Use Town Center

**M-X-C** Mixed Use Community

→ **LMXC** Legacy Mixed-Use Community (New)

## COMPREHENSIVE DESIGN ZONES

**V-L** Village-Low

**V-M** Village-Medium

**L-A-C** Local Activity Center (Neighborhood, Village, Community)

**M-A-C** Major Activity Center (Major Metro Center, New Town Center or Corridor City Center)

**R-L** Residential Low Development

**R-S** Residential Suburban Development

**R-M** Residential Medium Development

**R-U** Residential Urban Development

**E-I-A** Employment and Institutional Area

→ **LCD** Legacy Comprehensive Design (New)

**EXCEPTION:** When located in a Plan 2035 designated center, use the Transit-Oriented/Activity Center Base Zones Decision Matrix on page 16.

## URBAN CENTERS AND CORRIDOR NODES ZONES

**UC-1** Metropolitan Urban Center District

**UC-2** Regional Urban Center District

**UC-3** Community Urban Center District

**UC-4** Urban Corridor Node

→ **DELETED**

Deletion of the following zones is proposed because zone structures are duplicated or no longer in use; C-R-C, R-L, R-S, R-M, R-U, E-I-A, V-L, V-M, L-A-C, M-A-C, R-P-C, M-X-T, M-U-I, UC-4, UC-3, UC-2, UC-1, R-O-D, A-C-O, T-D-O, and D-D-O.

# Mixed-Use Zone Decision Matrix

## M-X-T • M-U-I

### Outside of Plan 2035 Designated Centers

(If your property is within the boundary of a Plan 2035 center use the Transit-Oriented/Activity Center Base Zone Matrix on page 16.)

For the purposes of this decision matrix, all contiguous groups of mixed-use-zoned properties (M-X-T and M-U-I) or those within 500 feet of each other will be treated as one, unless separated by a major road, railroad track, or body of water.

**Please use the US 1/ Innovation Corridor Decision Matrix on page 20.**

**Start Here ▶**

**1** Is your property within the Plan 2035 Innovation Corridor and/or along the US 1 Corridor?
Yes ▲
No ▼

**2** Is your property within 500 feet of the Rural and Agricultural Area, with no major road between?
Yes ▼   No ▼

Your new zone will be **RMF-12**

Go to Question 7

**3** Is there an approved CDP, CSP, DSP, SDP or PPS* for your property?
Yes ▶
No ▼

**4** Yes ▲
Are there any master plan policies or strategies that provide development guidance for your property?
No ▶

**5** No ▲
Is your property vacant or undeveloped?
Yes ▶

8 *Conceptual Design Plan (CDP), Conceptual Site Plan (CSP), Detailed Site Plan (DSP), Specific Design Plan (SDP), or Preliminary Plan of Subdivision (PPS)



**7** Are the approved ❸, proposed ❹, or existing ❺ uses for the property predominately residential?

*Yes* ▼  *No* ▶

**8** Is the property on a major* or minor road? ▶

**MAJOR**
Your new zone will be
**RMF-48**

**MINOR**
Your new zone will be
**RMF-20**

**9** What is the highest intensity abutting zone?

If there is no abutting zone, then what is the nearest zone to your property?

Is it CGO Zone?
◀ *Yes*

Is it CS Zone?
◀ *Yes*

Is it IE Zone?
◀ *Yes*

Is it IH Zone?
◀ *Yes*

Is it RMF-12 or lower?
◀ *Yes*

Is it RMF-20 Zone or higher?
◀ *Yes*

Your new zone will be
**CGO**

Your new zone will be
**CS**

Your new zone will be
**IE**

Your new zone will be
**IH**

Your new zone will be
**CN**

**6** ▲*Yes*  *No*▲

Is the highest intensity zone that is next to or nearest your property a residential zone?

**MAJOR**
Your new zone will be
**CS**

**MINOR**
Your new zone will be
**CN**

**10** Is the property on a major* or minor road?

*For the purposes of this decision matrix, a major road is defined as a freeway, expressway, arterial, or major collector.

# TEST CASE 1: Upper Marlboro

| Site: Dunkin Donuts Property—M-X-T to RMF-48 | |
|---|---|
| Location: Northwest quadrant of Route 301 and MD 725 | |
| Current Zone: M-X-T | |
| | |
| Is your property within the Plan 2035 Innovation Corridor and/or along the US 1 Corridor? | No |
| Is your property within 500 feet of the Rural and Agricultural Area, with no major road between? | No |
| Is there an approved CDP, CSP, DSP, SDP, or PPS for your property? | No |
| Are there any master plan policies or strategies that provide development guidance for your property? | YES—Subregion 6 Master Plan and SMA<br><br>Policy (Page 205, 2nd paragraph)—Northwest Quadrant<br><br>• Strategy 1: Rezone the properties south of Balmoral to MD 725 to the M-X-T Zone to maximize opportunities for high-quality, mixed-use development.<br><br>• Strategy 2: Provide a mix of development opportunities, including types of housing that complement and support the Town of Upper Marlboro.<br><br>• Strategy 7: Decrease development density/intensity as development moves away from MD 301 toward the floodplain. |
| Is the detailed site plan, master plan policy/strategy, or current development on the property predominately residential or nonresidential? | Primarily residential |
| | |
| Is the property on a major or minor road? | Major road (Robert Crain Highway, Route 301) |
| | |
| New Zone | Residential, Multifamily-48 (RMF-48) |
| NOTES | |

The RMF 48 Zone provides lands for a high-density multifamily development (up to 48 dwelling units per acre), along with other forms of development that support residential living and walkability in appropriate locations along commercial corridors.

Development allowed in the RMF-48 Zone includes: multifamily dwellings; live/work units; recreation/entertainment; personal services; and retail sales and services uses that support residential living and walkability, mixed-use development, and supporting public facilities.

The existing gas station will become a "deemed conforming" use per the new zoning ordinance transitional provisions.

# Sample Matrix:
## Upper Marlboro

**Start Here** ▶

**1** Is your property within the Plan 2035 Innovation Corridor and/or along the US 1 Corridor?
Yes ▲
No ▼

Please use the US 1/Innovation Corridor Decision Matrix on page 20.

**2** Is your property within 500 feet of the Rural and Agricultural Area, with no major road between?
Yes ▼  No ▼

Your new zone will be **RMF-12**

**3** Is there an approved CDP, CSP, DSP, SDP or PPS* property?
Yes ▶
No ▼

**4** Yes ▲
Are there any master plan policies or strategies that provide development guidance for your property?
No ▶

**5** No ▲
Is your property vacant or undeveloped?
Yes ▼

Go to Question 7

**6** ▲Yes   No▲
Is the highest intensity zone that is next to or nearest your property a residential zone?

MAJOR Your new zone will be **CS**   MINOR Your new zone will be **CN**

**10** Is the property on a major* or minor road?

**7** Are the existing, proposed, or approved uses for the property predominately residential?
Yes ▼    No ▶

**8** Is the property on a major* or minor road?
▶ MAJOR Your new zone will be **RMF-48**
▶ MINOR Your new zone will be **RMF-20**

**9** What is the highest intensity abutting zone?
If there is no abutting zone, then what is the nearest zone to your property?

Is it CGO Zone?
◀ Yes    Your new zone will be **CGO**

Is it CS Zone?
◀ Yes    Your new zone will be **CS**

Is it IE Zone?
◀ Yes    Your new zone will be **IE**

Is it IH Zone?
◀ Yes    Your new zone will be **IH**

Is it RMF-12 or lower?
◀ Yes    Your new zone will be **CN**

Is it RMF-20 Zone or higher?
◀ Yes

For the purposes of this decision matrix, a major road is defined as a freeway, expressway, arterial, or major collector.



# TEST CASE 2: Beltsville

## M-X-T to CGO

Location: Northwest quadrant of Old Gunpowder Road and Ammendale Road (Beltsville)

Current Zone: M-X-T

| | |
|---|---|
| Is your property within the Plan 2035 Innovation Corridor and/or along the US 1 Corridor? | No |
| Is your property within 500 feet of the Rural and Agricultural Area, with no major road between? | No |
| Is there an approved CDP, CSP, DSP, SDP, or PPS for your property? | No |
| Are there any master plan policies or strategies that provide development guidance for your property? | YES—2010 Subregion 1 Master Plan and SMA<br><br>The M-X-T Zone is to be targeted for an office and technology mix of uses with allowance for a modest amount of retail and multifamily residential (not exceeding 50 percent of the square footage of the development) with a high quality of design. Residential density shall be limited to 12 units to the acre; however, if an assemblage of more than 10 acres is joined in an application. |
| Is your property vacant or undeveloped? | No |
| Is the CDP, CSP, DSP, SDP, or PPS, master plan policy/strategy, or current development on the property predominately residential or nonresidential? | Primarily nonresidential |
| What is the highest intensity abutting zone?<br><br>If there is no abutting zone, then what is the closest zone to your property? | C-O (Commercial Office), which will convert to CGO (Commercial General Office) in the new ordinance |
| New Zone | Commercial General Office (CGO) |

| | NOTES |
|---|---|
| The CGO zone provides land for a diverse range of business, civic, and mixed-use development, typically at major intersections where visibility and good access are important, in a form that supports connections and a balance between good automobile access and pedestrian-friendliness.<br><br>Development allowed in the CGO Zone includes retail sales and services; personal services; eating or drinking establishments; recreation and entertainment; offices; limited vehicle sales and services; institutional; commercial marine and water-oriented activities along waterfronts; mixed-use development (including residential); and supporting public facilities. | |

12

## M-X-T to IE

Location: Martin Luther King Junior Boulevard and Annapolis Road

Current Zone: M-X-T

| | |
|---|---|
| Is your property within the Plan 2035 Innovation Corridor and/or along the US 1 Corridor? | No |
| Is your property within 500 feet of the Rural and Agricultural Area, with no major road between? | No |
| Is there an approved CDP, CSP, DSP, SDP, or PPS for your property? | No |
| Are there any master plan policies or strategies that provide development guidance for your property? | YES—2010 Glenn Dale-Seabrook-Lanham and Vicinity Sector Plan and SMA |
| | The development program includes figures related to the possible development of a new mixed-use center to the north of the existing Vista Gardens Marketplace. However, these figures only reflect the development concept illustrated in this sector plan and do not include the construction of other buildings that could be part of a long-term comprehensive redevelopment of the Vista Gardens Marketplace. Retail: 195,000 square feet, Flex Space (Office/Multifamily Over Retail): 132,000 square feet, Townhouse Office: 359,400 square feet |
| | • Multifamily Residential: 69 dwelling units |
| | • Residential Townhouses: 60 dwelling units |
| | • Light Industrial Office: 63,100 square feet |
| | • Light Industrial: 46,100 square feet |
| | • Flex Space (Office/Multifamily Over Retail): 132,000 square feet |
| Is your property vacant or undeveloped? | No |
| Is the CDP, CSP, DSP, SDP, or PPS, master plan policy/strategy, or current development on the property predominately residential or nonresidential? | Primarily nonresidential |
| What is the highest intensity abutting zone? If there is no abutting zone, then what is the closest zone to your property? | I-1(Light Industrial), which will convert to IE (Industrial/Employment) in the new ordinance |
| New Zone | Industrial/Employment (IE) |

## NOTES

The IE zone provides land for a mix of employment, research and development, and light industrial development, with an expectation of high quality design that is set apart from the high-traffic-generating commercial zones and residential communities.

Development allowed in the IE Zone includes office, light industrial, warehouse, research and development, light manufacturing, warehousing, and supporting activities, small-scale outdoor uses that can be operated with minimal adverse impacts on the environment and surrounding uses—as well as limited small-scale commercial uses (e.g., flex buildings and ancillary commercial uses serving zone businesses and their employees), and storage uses serving light industrial uses. Intensive forms of industrial development are prohibited, as well as outdoor manufacturing, processing, and storage.

Residential townhouse is not a permitted use in the IE zone.

## TEST CASE 4: Accokeek

| M-X-T to RMF-48 | |
|---|---|
| Location: Northeast corner of Indian Head Highway and Berry Road | |
| Current Zone: M-X-T | |

| | |
|---|---|
| Is your property within the Plan 2035 Innovation Corridor and/or along the US 1 Corridor? | No |
| Is your property within 500 feet of the Rural and Agricultural Area, with no major road between? | No |
| Is there an approved CDP, CSP, DSP, SDP, or PPS for your property? | YES—DSP-04063/03 (Residential) |
| Is the CDP, CSP, DSP, SDP, or PPS, master plan policy/strategy, or current development on the property predominately residential or nonresidential? | Primarily residential |

| | |
|---|---|
| New Zone | Residential, Multifamily-48 (RMF-48) |

| NOTES | |
|---|---|

The RMF-48 zone provides land for a high-density multifamily development (up to 48 dwelling units per acre), along with other forms of development that support residential living and walkability that are:

- Primarily high-density residential in character and form
- Proximate to centers (including transit centers), or in appropriate locations along commercial corridors
- Respectful of the natural features of the land
- Compatible with surrounding lands.

Development allowed in the RMF-48 Zone includes: multifamily dwellings; live/work units; recreation/entertainment; personal services; and retail sales and services uses that support residential living and walkability, mixed-use development, and supporting public facilities.





# TEST CASE 5: Accokeek

## M-X-T to CN

Location: Southeast corner of Indian Head Highway and Berry Road

Current Zone: M-X-T

| | |
|---|---|
| Is your property within the Plan 2035 Innovation Corridor and/or along the US 1 Corridor? | No |
| Is your property within 500 feet of the Rural and Agricultural Area, with no major road between? | No |
| Is there an approved CDP, CSP, DSP, SDP, or PPS for your property? | YES—South of Berry Road entitlements: DSP-01036/04 for 7-11, Wendy's and Credit Union and large office building. Built between 2000-2005 |
| Is the CDP, CSP, DSP, SDP, or PPS, master plan policy/strategy, or current development on the property predominately residential or nonresidential? | Primarily nonresidential |
| What is the highest intensity abutting zone? If there is no abutting zone, then what is the closest zone to your property? | R-R (Rural Residential), which will convert to similarly named RR (Residential Rural) in the new ordinance. |

| New Zone | Commercial Neighborhood (CN) |
|---|---|

### NOTES

The CN zone provides land for a diverse range of small-scale, low-intensity retail and service commercial development that provides goods and services primarily serving the daily needs of residents of the immediately surrounding neighborhoods.

Development allowed in the CN Zone includes retail sales and services; personal services, eating establishments, recreation and entertainment, offices, limited vehicle sales and services, institutional uses, and supporting public facilities. Medium-density residential development is encouraged on the upper floors of nonresidential establishments, and may exist as stand-alone buildings when integrated into a horizontal mixed-use development.



# Transit-Oriented/Activity Center Base Zones Decision Matrix

Plan 2035 developed a center classification system to help implement the County's vision for long-term growth and development. The zoning ordinance will utilize the center boundaries as designated in Plan 2035 for assigning Center Base Zones and will not amend or create new boundaries.

The system organizes the County's <u>All</u> centers into two principal categories—Regional Transit Districts and Local Centers. Centers are classified based on their function and desired density and intensity of development (see Plan 2035 Center Classification) and identifies areas critical for preservation and long-term neighborhood stabilization and investment. The 34 Plan 2035 Centers <u>except for Suitland Metro and most of the Riverdale MARC</u> will be assigned to one of the five center base zones. <u>Suitland Metro, a Plan 2035 Regional Transit District, is currently zoned M-U-TC and will receive the LMUTC zone (see page 7).</u>

**REGIONAL TRANSIT DISTRICTS** are high-density, vibrant, and transit-rich mixed-use areas envisioned to capture the majority of future residential and employment growth and development in the County (also see Plan 2035 Center Classification):

1. **Downtown; Regional Transit-Oriented High- Intensity (RTO-H Zone)**
   a. Largo Town Center
   b. New Carrollton Metro
   c. Prince George's Plaza Metro

2. **Regional Transit-Oriented Low-Intensity (RTO-L Zone)**
   a. Branch Avenue Metro
   b. College Park/UM Metro/M Square Purple Line
   c. Greenbelt Metro
   d. National Harbor

**LOCAL CENTERS** are focal points of concentrated residential development and limited commercial activity serving our Established Communities (also see Plan 2035 Center Classification):

1. **Local Transit-Oriented (LTO Zone)**
   a. Addison Road Metro
   b. Capitol Heights Metro
   c. Cheverly Metro
   d. Landover Metro
   e. Takoma/Langley Crossroads
   f. Morgan Boulevard Metro
   g. Naylor Road Metro
   h. West Hyattsville Metro

2. **Town Activity Center (TAC Zone)**
   a. Bowie
   b. Brandywine
   c. Konterra
   d. Landover Gateway
   e. Westphalia

3. **Neighborhood Activity Center (NAC Zone)**
   a. Annapolis Road/ Glenridge
   b. Beacon Heights
   c. Muirkirk MARC
   d. Oxon Hill
   e. Port Towns
   f. Riverdale Park
   g. Seabrook MARC
   h. Southern Avenue Metro
   i. Bowie MARC
   j. UMD Center
   k. UMD West

**DEFINED VS. UNDEFINED CENTER BOUNDARIES**

- **Defined:** Prince George's County contains 24 Plan 2035 centers that have parcel specific boundaries. The boundaries of these 24 centers clearly delineate which properties are wholly within the center's boundaries.

- **Undefined:** The remaining Plan 2035 centers do not have parcel specific boundaries. Instead, they utilize a half-mile radius from their center point. Future master plans will delineate parcel specific boundaries for these centers.

---

* Riverdale MARC and UMD East <u>are</u> designated Local Center located within the US1/Innovation Corridor. Refer to the decision matrix on page 22. <u>A small portion at the southeast of the Riverdale MARC center is located outside the US 1/Innovation Corridor area and will be rezoned according to the methodology on the next page for Neighborhood Activity Centers.</u>



**Start Here** ▶

Use Decision Matrix on page 22.

**Is the property within the US 1/Innovation Corridor?**
◀ Yes    No ▶

**Is any portion of the property within the boundary of a Plan 2035 Center?**
▼ Yes    No ▶

Use New Zone Conversion Chart on page 4.

**Is the property zoned RT or lower?***
◀ No    Yes ▶

◆ **Is the property within any of the following Plan 2035 Centers?**

UMD Center
UMD West
Riverdale Park
Annapolis Road/
Glenridge

Port Towns
Branch Avenue Metro
Southern Avenue Metro
Beacon Heights

▼ No    Yes ▶

**Is 50% or more of the property within the boundary of a Plan 2035 Center?**
◀ Yes    No ▶

**Is it a Plan 2035 Local Center?**
▼ Yes    No ▼

**Is it a Plan 2035 Downtown?**
Yes ▼    No ▶

**Is it in the defined Core?**
Yes ▼    No ▶

Your new zone will be **RTO-L Edge**

**Is it a Plan 2035 Local Transit Center?**
Yes ▼    No ▼

**Is it in the defined Core?**
Yes ▼    No ▼

Your new zone will be **RTO-H Core**

Your new zone will be **RTO-H Edge**

Your new zone will be **RTO-L Core**

**Is it in the defined Core?**
Yes ▼    No ▼

Your new zone will be **LTO Core**

Your new zone will be **LTO Edge**

**Is it a Plan 2035 Town Center?**
Yes ▶    No ▶

Your new zone will be **TAC**

Your new zone will be **NAC**

*R-T and lower zones include R-O-S: Reserved Open Space; O-S: Open Space; R-A: Residential-Agricultural; R-E: Residential-Estate; R-R: Rural Residential; R-80: One-Family Detached Residential; R-55: One-Family Detached Residential; R-35: One-Family Semidetached and Two-Family Detached; R-20: One-Family Triple-Attached Residential; R-M-H: Planned Mobile Home Community; R-S: Residential Suburban Development; R-M: Residential Medium Development; V-L: Village-Low; V-M: Village-Medium; R-T: Townhouse. Properties with these zones will not receive a Transit-Oriented/Activity Center Base zone.

## TEST CASE 1: BRANCH AVENUE METRO (Undefined Boundary)

| Plan 2035 Center Classification: REGIONAL TRANSIT DISTRICT | | Property 1 | Property 2 | Property 3 |
|---|---|---|---|---|
| Current Zone | | C-S-C | I-1 | R-55 |
| **DECISION MATRIX** Is the property currently zoned R-T or lower? | | NO | NO | YES |
| Does the Center have an undefined boundary (1/2 mile radius) | | YES | YES | Use New Zone Conversion Chart on page 4. |
| 50% or more within the boundary? | | NO | YES | |
| Is it a Local Center? | | Use New Zone Conversion Chart on page 4 | NO | |
| Is it a Downtown? | | | NO | |
| Located in designated Core? | | | NO | |
| **Proposed New Zone** | | **CGO** | **RTO-L Edge** | **RSF-65** |





**CORE AND EDGE AREAS** (for RTO-L, RTO-H, LTO, and TAC Zones): The new zoning ordinance establishes a Core and/or Edge areas (or subzones) within all RTO, LTO, and TAC zones. Plan 2035 centers (zoned RTO, LTO, or TAC) are intended to be walkable, mixed-use areas organized around a core and edge. The NAC zone does not have Core or Edge areas.

**Core Area:** The Core area shall include land that is within convenient walking distance (generally about ¼ mile) of the existing or proposed transit station/stop, if any, around which the zone is centered or/and otherwise has a high potential for higher-intensity, mixed-use, pedestrian-oriented, and transit-supportive development. The following Plan 2035 centers contain both an Edge and Core area as designated in its respective master plan:

  Brandywine (TAC)
  Capitol Heights Metro (LTO)
  Cheverly Metro (LTO)
  College Park/UM Metro (RTO-L)
  Greenbelt Metro (RTO-L)
  Landover Metro (LTO)
  Landover Gateway (TAC)
  Largo Town Center Metro (RTO-H)
  Morgan Boulevard Metro (LTO)
  National Harbor RTO-L
  Naylor Road Metro (LTO)
  New Carrollton Metro (RTO-H)
  Prince George's Plaza Metro (RTO-H)
  Takoma/Langley Crossroads (LTO)
  West Hyattsville Metro (LTO)

# TEST CASE 2: LARGO TOWN CENTER (Defined Boundary)

| Plan 2035 Center Classification: DOWNTOWN | Property 1 | Property 2 | Property 3 |
|---|---|---|---|
| Current Zone | M-X-T | C-O | R-R |
| **DECISION MATRIX** — Is the property currently zoned R-T or lower? | NO | NO | YES |
| Does the Center have an undefined boundary (1/2 mile radius) | NO | NO | Use New Zone Conversion Chart on page 4. |
| Is it a Local Center? | NO | NO | |
| Is it a Downtown? | YES | YES | |
| Located in designated Core? | YES | NO | |
| **Proposed New Zone** | **RTO-H Core** | **RTO-H Edge** | **RR** |

**Edge Area:** The remainder of the zone shall be designated as the zone's Edge area, which is intended to accommodate less intense development with more of a residential mix and less emphasis on commercial development. If the center does not contain a defined core, the Edge area zone will be applied to all properties except single-family zoned land (ROS, AG, AR, RE, RR, RSF-A, RSF-65, and RSF-95).

**The Test Case tables** (above) show how Properties 1, 2, and 3 will be rezoned using the Transit-Oriented/Activity Center Base Zones Decision Matrix.





# US 1/Innovation Corridor

*Plan Prince George's 2035 Approved General Plan* (Plan 2035) is a blueprint for the long-term growth and development of Prince George's County, Maryland. Plan 2035 looks broadly and strategically at how the County should continue to grow and strengthen over the next 20 years as a community and as part of the greater Washington metropolitan area.

The Innovation Corridor is one of five Plan 2035 designated Employment Areas. Plan 2035 Employment Areas are areas commanding high concentrations of economic activity in four targeted industry clusters—healthcare and life sciences; business services; information, communication, and electronics; and the federal government.

Plan 2035 identifies the Innovation Corridor as the highest priority Employment Area. It designates parts of the City of College Park, the City of Greenbelt, the City of Hyattsville, the Town of Riverdale Park, the Town of Edmonston, the Town of Berwyn Heights, the Town of University Park, and other areas along the US 1 Corridor and around the University of Maryland, and the Beltsville Agricultural Research Center (BARC) as the Innovation Corridor.

The Innovation Corridor has the highest concentrations of economic activity in the four targeted industry clusters and has the greatest potential to catalyze future job growth, research, and innovation in the near- to mid-term. This area is well positioned to capitalize on the synergies that derive from businesses, research institutions, and incubators in close proximity to one another and near existing or planned transportation investment, such as the Purple Line. As a result, the Innovation Corridor requires a unique combination of zones appropriate to its location to achieve Plan 2035 economic and job growth goals. The US 1/Innovation Corridor Decision Matrix is a tool for determining the appropriate zones for properties in the corridor that help achieve countywide goals as well as realize the community vision.

Additionally, the portion of US 1 south of the Innovation Corridor, extending to the District of Columbia, is encompassed by the Gateway Arts District, designated as a Maryland State Arts and Entertainment District in 2001 to promote community involvement, tourism, and revitalization through tax-related incentives that attract arts organizations and other creative enterprises. Since the designation of the Gateway Arts District, the County has realized substantial investment and revitalization along southern US 1 at a scale well-suited for the new Transit-Oriented/Activity Center zones. Investment opportunities within the arts district are unique within the County, providing investors and entrepreneurs interested in arts-related enterprises with artist live-work spaces, complementary retail establishments, production and crafting spaces, and performance arts venues that contribute to a vibrant, arts-based economic engine.



# Innovation Corridor Location Map



**LEGEND**
**Master Plans**

- Subregion 1
- Central US 1 Corridor
- Greenbelt Metro Area and MD 193 Corridor
- Langley Park-College Park-Greenbelt and Vicinity
- Riverdale Park MUTC
- Gateway Arts District

Howard

City of Laurel

Montgomery

District of Columbia

21

# US 1/Innovation Corridor Decision Matrix

This decision matrix is for the use of all non-single family or rural and agricultural-zoned properties **within 1,000 feet** of the US 1 centerline and/or located within the Innovation Corridor. If the property is not located within one of the following master plans, use the New Zone Conversion chart on page 4.

## Subregion 1 Master Plan

Please use the New Zone Conversion chart on page 4.

## Central US 1 Corridor Sector Plan

**Is your property in:**

**A Walkable Node? (University)**
◀ **Yes**

Your new zone will be **RTO-L Edge**

**A Walkable Node?**
◀ **Yes**

Your new zone will be **LTO Edge**

**A Corridor Infill?**
◀ **Yes**

Your new zone will be **NAC**

**All other areas** ▶

## Greenbelt Metro Area and MD 193 Corridor Sector Plan

If M-X-T or MUI, go directly to question three of the decision matrix on page 8.

All other zones, please use the New Zone Conversion chart on page 4.

Please use the New Zone Conversion chart on page 4.



# Choose your plan.

Which plan listed below guides the zoning in the area where your property is located?



## Gateway Arts District Sector Plan

**Is your property zoned M-U-TC?**

*No* ▼　　*Yes* ▶

**Your new zone will be**
**LMUTC**

## Riverdale Park M-U-TC Development Plan

## Langley Park-College Park- Greenbelt and Vicinity Master Plan

**Please use the New Zone Conversion chart on page 4.**

**Is your property within one of the Character Areas:**

- Town Center (and not zoned M-U-TC)?
- Arts Production and Entertainment?
- Neighborhood Arts and Production?

*Yes* ▼　　*No* ▶

**Please use the New Zone Conversion chart on page 4.**



**Your new zone will be**
**NAC**

# Recently Approved Sector Plans

The 2018 *Approved Greater Cheverly Sector Plan* and 2018 *Approved East Riverdale-Beacon Heights Sector Plan* were developed concurrently with the Zoning Ordinance Rewrite. However, both plans were approved by the District Council prior to approval of the Zoning Ordinance Rewrite and the new zones contained within. As a result, the comprehensive rezoning of properties within the boundaries of these sector plans will happen through the Zoning Ordinance Rewrite's Countywide Map Amendment (CMA) process. This CMA will implement the new land use and policy guidance of these two sector plans by assigning appropriate new zones within the sector plan boundaries in accordance with the New Zone Conversion Chart on page 4, the Mixed-Use Zone Decision Matrix on page 8, and the Transit-Oriented/Activity Center Base Zones Decision Matrix on page 16. Where these result in a recommended zone for a property that conflicts with the approved future land use maps of these two sector plans, the zone that meets the intent of the approved sector plan recommendations for those properties shall be used.



**Greater Cheverly Sector Plan Area Map**



**East Riverdale-Beacon Heights Sector Plan Area Map**



The Maryland-National Capital Park and Planning Commission
Prince George's County Planning Department
pgplanning.org



# Prince George's County Regional Meeting Areas

## Regional Meeting Areas

- **North**
- **Central**
- **South**
- City of Laurel
- Roads
- Other Areas

Howard County

Montgomery County

District of Columbia

Anne Arundel County

Fairfax County

Potomac River

Calvert County

Patuxent River

Charles County

This map may not be reproduced, stored in a retrieval system, or transmitted by any form, including electronic or by photo reproduction, without the express written permission of The Maryland-National Capital Park and Planning Commission. For more information contact the Prince George's County Planning Department in Upper Marlboro, Maryland.

Date Created: 3/14/2019

0    5    10
Miles

Created By: Nick Ward, CWPD